**Leslie H. SHAW, Sr., Respondent,**

**v.**

**James SCOTT d/b/a Scotty's Drywall, Appellant.**

**No. WD 58992.**

Missouri Court of Appeals, Western District.

June 26, 2001.

James D. Worthington, Lexington, for appellant.

Thomas V. Clinkenbeard, Kansas City, for respondent.

Before THOMAS H. NEWTON, P.J., JOSEPH M. ELLIS, J., and RONALD R. HOLLIGER, J.

NEWTON, Judge.

### Factual and Procedural Background

Leslie "Les" Shaw worked for Scotty's Drywall, owned by James Scott ("Scotty"). Besides being his employer and supervisor, Scotty was also Mr. Shaw's friend for over thirty years. Mr. Shaw had worked for Scotty for six years, and, before that, the two had done drywall work for twenty-three years, a job that requires good balance, coordination, and equilibrium. On October 3, 1994, Mr. Shaw was hanging drywall when he felt a sharp pain shoot through his neck and the side of his head. He developed a hemifacial spasm that, over the next few weeks, got progressively worse and more severe. He continued to report to work until Scotty gave him permission to see a doctor. Scotty sent Mr. Shaw to Dr. James Foltz, who referred him to Dr. William LaHue. Mr. Shaw saw Dr. LaHue on December 19, 1994, and he instructed Mr. Shaw to be off work from December 19, 1994, through December 30, 1994, and to take certain medications.

With Scotty's approval at every step, Mr. Shaw was given a series of referrals and was seen by several doctors. After Dr. LaHue, he next went for medical advice, examination, and treatment to Dr. Charles Lea, who referred him to Dr. Keith Byars for special examination and treatment. Dr. Byars referred Mr. Shaw to Dr. V. Kent Cooper, who Mr. Shaw first saw on February 27, 1995. Dr. Cooper did various examinations and treatments with medication, and he referred Mr. Shaw to Dr. Richard Dubinsky, a specialist in neurology at the University of Kansas Medical Center in Kansas City, Kansas. Dr. Dubinsky saw Mr. Shaw for the first time on August 14, 1995. After a full examination and diagnostic procedures, Dr. Dubinsky concluded that Mr. Shaw required surgery for what was diagnosed as a "right hemifacial twitch and spasm".

Dr. Dubinsky explained to Mr. Shaw that he had three treatment options. The first option was oral medications. Over the course of the previous year, Mr. Shaw had been prescribed the anticonvulsant Carbamezipine, Clonazepam, which is a valium family drug, and Baclofen, a drug that affects chemical systems in the brain stem and spinal cord. Each of these drugs had adverse side effects for Mr. Shaw and did not relieve his spasm. The other two choices were botulinum toxin injections or a surgical procedure known as microvascular decompression of the facial nerve. After discussions with his wife, Mr. Shaw opted for surgery. Not knowing any local neurosurgeons qualified to do the procedure in the Kansas City area, Dr. Dubinsky recommended one of the pioneers of the procedure, Dr. Peter Jannetta, in Pittsburgh, Pennsylvania.

Mr. Shaw made a claim for worker's compensation on October 7, 1995.[1] Mr. Shaw requested a hardship hearing pursuant to § 287.203[2] on or about December 26, 1995. Shortly before the workers' compensation hearing on March 28, 1996, Mr. Shaw submitted to an examination by Dr. Andrew B. Kaufman in Kansas City, Missouri. At the hearing, both sides stipulated that further medical treatment should be done by Dr. Kaufman, who testified by deposition that he was familiar with and capable of performing the surgery. Mrs. Shaw testified that she and Mr. Shaw had been receiving bills from the various doctors her husband had seen, each of which were approved by Scotty, and they were being contacted by collection agencies regarding those doctor bills. The Administrative Law Judge (ALJ) issued a temporary or partial award on June 12, 1996. He awarded Mr. Shaw past medical expenses, temporary total disability (TTD) benefits for the periods of December 19, 1994, through December 30, 1994, and November 3, 1995, until the time of hearing, future temporary total disability, and future medical care costs and expenses. The ALJ denied Mr. Shaw's claim for attorney fees pursuant to § 287.203; and according to § 287.203, if payments had been made and then unjustifiably terminated, attorney fees may have been considered, but the evidence was clear that neither Scotty nor his insurer, Allied Mutual, (Allied) had at any time made payment for workers' compensation benefits or supplied any medical treatment. Attorney fees were provided on other grounds, however.

Dr. Kaufmann performed microvascular decompression of Mr. Shaw's right facial nerve on April 16, 1996. Although the surgery resulted in substantial improve-

---

1. Scotty filled out a Report of Injury dated March 10, 1995.

2. Unless otherwise indicated, all statutory references are to RSMo 1994.

ment of his hemifacial spasm, he began to experience a myriad of problems, such as a ringing in his ears, problems seeing and hearing, and confusion due to his difficulty remembering things. Mr. Shaw was unable to walk without a cane, and he fell frequently. He required assistance with bathing and shaving. He did not sleep well, and he was depressed and testy. He also suffered from frequent headaches. These symptoms were all due to his injury, the surgery, and the medications.

Dr. Kaufman released Mr. Shaw to return to limited work on October 11, 1996. He advised that Mr. Shaw's work be limited due to the risk to himself and to others if he were to have a sudden and unpredictable severe attack of spasm. On November 3, 1996, Mr. Shaw attempted to return to work. Despite his three decades of drywall work, Scotty had to instruct Mr. Shaw how to do his job. Mr. Shaw discontinued working when he fell while on the job three days later. He told Scotty that his knees "gave away." Thereafter, Scotty paid several social visits to Mr. Shaw's home. Dr. Kaufman advised that Mr. Shaw should not continue working because of the risk of injury if he fell. He also opined that Mr. Shaw's condition was related to his original injury.

Allied terminated temporary total disability benefits on November 7, 1996, and delayed medical care, contrary to the ALJ's 1996 award. Allied's position was that Mr. Shaw's facial nerve problem had been corrected, and they believed that he was suffering from a new problem related to his knee. Mr. Shaw was granted a hardship hearing before the same ALJ on June 22, 1997, seeking enforcement of the previous award. Scotty testified that he never instructed anyone to limit, delay, or stop medical treatment or TTD benefits. He also testified that, although he had had part-time light-duty work available since

November 1996, he was afraid that Mr. Shaw would get hurt if he returned to work. Scotty's concern was related not only to Mr. Shaw's knees, but also to his other problems. Allied presented no witnesses and chose only to cross-examine Mr. Shaw's. The ALJ issued another temporary or partial award that reaffirmed the prior award, which ordered the payment of temporary total benefits from November 8, 1996, through the date of the hearing and continuing into the future, as well as that Mr. Shaw be provided with future medical care. This time, the ALJ also awarded costs and attorney fees under § 287.203 because temporary total disability benefits had been terminated and Mr. Shaw prevailed.

Allied engaged Dr. P. Brent Koprivica to examine Mr. Shaw on June 9, 1998. Based upon a review of Mr. Shaw's medical records and his examination, he concluded that Mr. Shaw's hemifacial spasm, hearing loss, tinnitus, and balance difficulties all resulted from his accident, and he further opined that Mr. Shaw's concomitant psychological responses to his physical disabilities, including his loss of memory, inability to concentrate, mood swings, and depression, rendered him unemployable in the open labor market.

A final hearing was held on June 17, 1999, and the ALJ issued a final award on July 26, 1999. The ALJ determined that Mr. Shaw was permanently and totally disabled as a result of the accident on October 3, 1994, and that the employer was responsible for continued medical care for the side effects of the injury, surgery, and medications. On July 27, 1999, Allied discontinued medical care payments, pharmacy bill payments, and TTD benefits.

Pursuant to § 287.480, Allied applied for review by the Labor and Industrial Relations Commission of the final award on August 11, 1999. While awaiting tran-

scripts of the two prior hearings, Mr. Shaw filed Motions to Dismiss the Application for Review, Alternative Request for Hardship Setting and Motions for Penalties, Civil Contempt and Attorney's Fees. On March 21, 2000, the Commission issued an Order denying the Motion to Dismiss the Application for Review because the delay in reviewing the claim was due to the transcripts from the two prior hearings not being prepared by the Division of Workers' Compensation. The Commission granted hardship status and deferred ruling on whether the award should be doubled pursuant to § 287.510. Mr. Shaw also requested that the Commission issue an interim award ordering the employer to provide medical care, which request was denied until the Commission could issue a final award. The Commission also denied the request for attorney fees.

Allied filed its brief before the Commission on April 26, 2000, and Mr. Shaw filed his brief on May 8, 2000. Mr. Shaw's brief renewed his request for penalties, civil contempt, costs and attorney fees. Allied did not respond to any of Mr. Shaw's motions. The Commission affirmed the ALJ's decision and further ordered that Allied pay $77,860.77 in penalties for noncompliance with both of the ALJ's temporary orders. The Commission found that Mr. Shaw "had to fight every step of the way to be provided the medical care and wages to which he was entitled pursuant to Chapter 287 RSMo."

Allied has appealed the imposition of the penalty and raises two points. First, it argues that the Commission abused its discretion in imposing the fine pursuant to sections 287.495 and 287.510 because the reasons expressed were factually incorrect and otherwise inadequate to support such a penalty. Second, it contends that the Commission abused its discretion in imposing the penalty because a penalty should be imposed only when noncompliance exists prior to the issuance of a final award. Further, it contends the Commission not only imposed the penalty improperly, but it also miscalculated the penalty.

## Standard of Review

The question of assessing the penalty is a matter that is discretionary with the Commission, and we will not interfere unless it clearly appears that the action of the Commission was clearly arbitrary and constituted an abuse of that discretion.[3] We will deem the act an abuse of discretion if it is shown that the ruling is clearly against the logic of the circumstances, so arbitrary and unreasonable as to shock the sense of justice, and lacking careful consideration.[4]

## Legal Analysis

*In any case a temporary or partial award of compensation may be made,* and the same may be modified from time to time to meet the needs of the case, and the same may be kept open until a final award can be made, *and if the same be not complied with, the amount thereof may be doubled in the final award, if the final award shall be in accordance with the temporary or partial award.*[5]

Allied argues that the Commission abused its discretion in imposing the fine pursuant to sections 287.495 and 287.510 because the reasons expressed were factu-

**3.** *Sutton v. Vee Jay Cement Contracting Co.,* 37 S.W.3d 803, 809 (Mo.App. E.D.2000).

**4.** *Rasse v. City of Marshall,* 18 S.W.3d 486, 489 (Mo.App. W.D.2000).

**5.** § 287.510 (emphasis added).

ally incorrect and otherwise inadequate to support such a penalty. After summarizing in its brief what it purports to be a comprehensive listing of cases that have addressed penalties under § 287.510, Allied contends that case law supports the proposition that, in these kinds of cases, there must be a willful and intentional act of noncompliance. Allied points out that the ALJ noted at the second hearing that there had been an "attempt to comply with the Order" and submits that its failure to pay due to an oversight, along with its attempt to comply with the award, indicate that it lacked the requisite intent to justify imposition of the penalty. Further, Allied insists that the oversight had otherwise been corrected and all benefits paid prior to the final evidentiary proceeding. Under these circumstances, Allied contends, the assessment of penalties is simply unprecedented.

■ The ALJ noted at the second hearing that "neither the employer nor the insurer acted arbitrarily or capriciously in terminating temporary total disability." In *Cebak v. John Nooter Boiler Works Co.*,[6] the court addressed the similar issue of whether the Commission has the authority to inflict the penalty *only if* the defense to payment is frivolous or vexatious. The court held that there is no such limitation contained in the statute.[7] The logical extension of that holding is that the employer's reasons for nonpayment are irrelevant, and we see no need to graft a requirement of ill-will or purposefulness onto the statute in this case. The plain language of the statute contains only one prerequisite to justify the doubling of the award: "if the [temporary award is] not complied with, the amount thereof may be

doubled in the final award...." Furthermore, the statute does not temporally fix the noncompliance to the moments preceding the final hearing before the ALJ.

Allied also contends that one basis of the Commission's imposition of the penalty was that eleven days of temporary total compensation was not paid. Allied points out that the penalty amounts to a punishment that is mathematically 204 times greater than the December 1994 nonpayment itself and argues that the disproportionate amount should shock one's sense of justice. The Commission determined and the record confirms that the award was not complied with, so the only necessary precondition was satisfied. In fact, the record is replete with instances of noncompliance with the June 1996 award: in its brief, Allied admits that eleven days of temporary compensation was not paid; Allied also admits that, at the second hearing, it was discussed "that certain medical bills may have been overlooked"; and the record is clear that Allied terminated temporary total disability benefits on November 7, 1996, and delayed medical care, all in contravention of the ALJ's 1996 award. Thus, Allied's suggestion that the doubling of the June 1996 award was based upon the nonpayment of $381.21 of temporary total compensation for an eleven-day period in December 1994 is quite disingenuous. The condition precedent to imposition of the penalty was fulfilled at the first instance when Allied failed to comply with the June 1996 award.[8]

■ Even if we isolated that one instance of noncompliance in December 1994, the fact that the penalty is approximately 204 times greater than the single

---

6. 258 S.W.2d 262 (Mo.App.1953).

7. *Id.* at 266.

8. *See Kirk v. Brown Shoe Co.*, 588 S.W.2d 62, 64–65 (Mo.App. S.D.1979) (holding that a delay in payment is sufficient to impose the penalty).

period of nonpayment does not shock our sense of justice. " 'The statute as written allows for the doubling of the entire award,' rather than [just] the period of noncompliance." [9] Allied insists that, at the time of the final award, all interim benefits had been paid, and, therefore, imposing a penalty under these circumstances is simply unprecedented. "The fact that [it] belatedly came into compliance with the [first] temporary award does not exempt [it] from the penalty." [10] Upon the first instance of noncompliance, § 287.510 vested the Commission with the discretion to double the 1996 award.

Allied also asserts that the Commission rested its decision to impose the penalty on a factually incorrect presumption that Allied "chose to cut off treatment one week before the final hearing [on June 10, 1999] without regard to the previous awards of the administrative law judge." Counsel for both Mr. Shaw and Allied agreed to stipulate to a Supplemental Legal File in this appeal. Within this file are copies of cancelled checks from Allied to Mr. Shaw which indicate that Mr. Shaw was, in fact, paid beyond June 10, 1999. We agree that the Commission was incorrect in this factual presumption.

In *Brenneisen v. Leach's Standard Service Station,*[11] the claimants asserted that the Commission erred as a matter of law in finding that the decedent employee's fatal injury did not arise out of and in the course of employment, and they further asserted that the Commission's order was based upon a clearly erroneous finding of fact.[12] The court agreed that the findings of the Commission were inconsistent with

the evidence of the case.[13] In reversing the Commission's decision to deny compensation, the court noted that the Commission had "overlooked [an] undisputed and crucial fact" that led to the conclusion that the decedent's injury was compensable.[14]

In this case, it is undisputed, indeed stipulated, that Allied continued payment to Mr. Shaw beyond June 10, 1999, contrary to the Commission's finding in its final award. The date, however, is not crucial to the Commission's decision to impose the penalty for violating the ALJ's temporary award; the termination of benefits and cessation of medical care, *i.e.* the flouting of the ALJ's 1997 award, as well as the 1996 award, both of which provided that the employer/insurer was required to pay future TTD and medical care expenses, is the crucial fact upon which the Commission based its decision to penalize Allied for noncompliance. The record establishes that Allied discontinued payments to Mr. Shaw on July 27, 1999, *one day after* the ALJ's final award on July 26, 1999. So, we agree that the Commission made an error in identifying the date, but it correctly identified the action taken by Allied in finding that it discontinued medical treatment without regard to the previous awards of the ALJ. From the time the ALJ issued the final award until the Commission issued its decision, Mr. Shaw did not receive any benefits. The temporary orders both provided that Mr. Shaw was to receive TTD benefits and future medical treatments. The latter award provided it was "subject to modification and review as

9. *Sutton,* 37 S.W.3d at 810 (quoting *Hendricks v. Motor Freight Corp.,* 570 S.W.2d 702, 710 (Mo.App.1978)).

10. *Sutton,* 37 S.W.3d at 810; *see Kirk,* 588 S.W.2d at 64.

11. 806 S.W.2d 443 (Mo.App. E.D.1991).

12. *Id.* at 444.

13. *Id.* at 446.

14. *Id.* at 447.

provided by law." The real issue, then, is whether, as the Commission found, the 1997 award was still in effect after the ALJ issued a "final award." [15]

If the award so provides, a temporary award is effective until a final award can be made.[16] Temporary total disability awards are designed to cover the employee's healing period, and they are owed until the claimant can find employment or the condition has reached the point of maximum medical progress.[17] When further medical progress is not expected, a temporary award is not warranted.[18] Any further benefits should be based on the employee's stabilized condition upon a finding of permanent partial or total disability.[19]

Once a final award is issued by the ALJ, a party may *apply for review* by the Commission within twenty days from the date of the award.[20] Review by the Commission results in a modified trial *de novo*. The Commission reviews the record, and, where appropriate, it will also determine the credibility of witnesses and the weight of their testimony, resolve any conflicts in the evidence, and reach its own conclusions on factual issues *independent*

of the ALJ.[21] Section 287.470 permits the Commission to end, diminish, or increase the compensation awarded by the ALJ in the "final award" "[u]pon its own motion or upon the application of any party in interest on the ground of a change in condition...." [22] Once the Commission renders a final award, it is conclusive and binding unless either party *appeals* the award to this court within thirty days of the final award.[23] Because "[t]he Commission is the ultimate trier of fact," [24] we review the findings of the Commission and not the ALJ.[25]

A "final award" is one that disposes of the entire controversy between the parties by arriving at a terminal and complete resolution of the case.[26] Based on the process of review of an award under the Workmens' Compensation Act that we have just outlined, there are several circumstances that will result in a truly "final" decision, but it is sufficient for the case at bar for us to say that an ALJ's final award is not "final" when review by the Commission is sought. An ALJ's final award is not "final" because it remains tentative, provisional, contingent, and subject to revision by the Commission.[27] Al-

15. *See* § 287.510.

16. § 287.510.

17. *Cooper v. Med. Ctr. of Independence,* 955 S.W.2d 570, 575 (Mo.App. W.D.1997).

18. *Boyles v. USA Rebar Placement, Inc.,* 26 S.W.3d 418, 424 (Mo.App. W.D.2000); § 287.510.

19. 82 Am.Jur.2d, *Workers' Compensation* § 431. "Permanent disability is determined and provided for only after temporary disability compensation is discontinued." *Schuster v. State Div. of Employment Sec.,* 972 S.W.2d 377, 381 (Mo.App. E.D.1998); *see* § 287.190.6; § 287.200.1.

20. § 287.480.

21. *Smith v. Richardson Bros. Roofing,* 32 S.W.3d 568, 571 (Mo.App. S.D.2000).

22. § 287.470.

23. § 287.495.

24. *Sanderson v. Porta–Fab Corp.,* 989 S.W.2d 599, 601 (Mo.App. E.D.1999).

25. *Bloss v. Plastic Enters.,* 32 S.W.3d 666, 670 (Mo.App. W.D.2000).

26. *Korte v. Fry–Wagner Moving & Storage Co.,* 922 S.W.2d 395, 397 (Mo.App. E.D.1996); *Lewis v. Container Port Group,* 872 S.W.2d 134, 136 (Mo.App. E.D.1994).

27. *See State ex rel. Riverside Pipeline Co., L.P. v. Public Serv. Comm'n.,* 26 S.W.3d 396, 400 (Mo.App. W.D.2000).

though the award is misleadingly titled "final award," its label does not produce an award that is "final."[28] Thus, Allied was obligated to continue payment under the temporary award issued in 1997 until the Commission issued its "final" final award.

■ Allied insisted at oral argument that this practice of discontinuing payment pending review by the Commission is customary, however. Counsel stressed that, under Missouri law, there is no reimbursement mechanism for payments made by an employer/insurer, unless, perhaps, under a theory of unjust enrichment. Counsel argued that requiring payment in the interim would present an interesting "catch 22": if the final award is not appealed, payment is owed, and, if the award is appealed, they still owe it despite having no mechanism for reimbursement in the event of a favorable outcome before the Commission.[29] Further, counsel analogized this situation to an appeal in civil court, where interest begins to accrue upon appeal, and, in this case, all amounts were paid with interest upon entry of the Commission's final award.[30] We agree that an "[e]mployer is subjected to future payments with no possibility of review concerning those individual payments *until a final award is entered*, and ... at that time reimbursement in the event of reversal could be questionable. This, however, is a dilemma which must be solved, if at all, by the legislature."[31]

We are concerned that Allied would seek to justify nonpayment with the slight possibility of reversal by the Commission and that it would discontinue payment and treatment out of fear that it would not be able to obtain reimbursement *when its own doctor testified that Mr. Shaw's condition was a result of the work-related accident and that Mr. Shaw was unemployable in his condition.* Review was sought before the Commission regarding only the extent of Mr. Shaw's disability. Mr. Shaw's entitlement to compensation and treatment had already been clearly established before the ALJ, in part, by Dr. Koprivca. Scotty testified at the second hearing that he had never instructed anyone to limit, delay, or stop medical treatment or TTD benefits, so we can infer that Scotty had no part in the decision to stop payments after the ALJ's final award. Mr. Shaw's need for treatment had already been established, yet Allied chose to discontinue payments in the event of reversal. During that time, families should be receiving payment as they are entitled under Chapter 287.[32] Injured employees should not be paying for their own medical treatment or, worse, going without medical treatment pending review by the Commission on the slight possibility that the Commission might reverse. Here, however,

28. *Cf. Hackathorn v. Four Seasons Lakesites, Inc.*, 959 S.W.2d 954, 957–58 (Mo.App. S.D. 1998) (finding that the judgment was not appealable notwithstanding the trial court's "express determination that there [was] no just reason for delay" pursuant to Rule 74.01(b)).

29. *See Lewis v. Container Port Group*, 872 S.W.2d 134, 136 (Mo.App. E.D.1994) ("According to employer/insurer, ... it must either refuse to pay, subjecting it to the potential doubling penalty set forth in § 287.510 ... if the award is ultimately upheld, or pay the award as ordered, including all ongoing medical bills, without any realistic possibility of recoupment if the ... award is ultimately reversed.") (regarding review of temporary award issued by an ALJ).

30. § 287.160.3.

31. *State ex rel. Lester E. Cox Med. Ctr. v. Wieland*, 985 S.W.2d 924, 927 n. 7 (Mo.App. S.D.1999) (quoting *Hillenburg v. Lester E. Cox Med. Ctr.*, 879 S.W.2d 652, 656 (Mo.App. S.D. 1994)) (emphasis added).

32. § 287.250.

the issue before the Commission was only "how much," not "if" Mr. Shaw was entitled to compensation. The law is simply not designed to allow for sporadic payments after each unfavorable decision, such as before the ALJ at the temporary hearing(s), then at the issuance of the ALJ's final award, and then again after the Commission issues its final award, like what happened here.

■ An employer's liability under the Workers' Compensation Act releases the employer from all other liability.[33] The insurer has the same status and protection under the Act.[34] Although he could have complained to the Missouri Department of Insurance,[35] utilization of the penalty provision of § 287.510 was Mr. Shaw's exclusive remedy for Allied's actions.[36]

Whether or not it intended to do so, Allied assumed the risk of being subjected to the penalty.[37] The final award was in accordance with the temporary awards. Based on the facts of this case, a doubling of the awards as a penalty for failure to comply with their terms was entirely appropriate, not an abuse of discretion.

Point one is denied.

■ Second, Allied contends that the Commission erred in imposing the penalty because § 287.510 should only be applied when noncompliance exists at the time of the issuance of a final award. It argues that the imposition of penalties for any earlier nonpayment that may have occurred between temporary awards is inconsistent with the intent of the statute. This position is clearly contrary to precedent that Allied cited in its brief. The intent of the statute, as the court found in *Cebak*, is "to encourage the payment of compensation during the interim between the temporary and final awards."[38] When nonpayment occurs prior to the final award, § 287.510 authorizes the imposition of a penalty to encourage employers and their insurers to not terminate payments under future orders unless they wish to again subject themselves to the possibility of a doubling of the award. "The fact that [Allied] belatedly came into compliance with [either] temporary award does not exempt [it] from the penalty."[39] It is inconsistent with the intent of the statute to condone the practice of nonpayment in the face of an award. The Commission focused on these points:

> If temporary or partial awards are to have any value or effect in law, they must be complied with until such time as an administrative law judge or the Commission issues a final award. An employer or its insurer cannot unilaterally conclude that an employee is no longer entitled to temporary total benefits or medical care. That is what has happened in this case. Section 287.510

**33.** § 287.120.

**34.** § 287.030.2.

**35.** Section 287.360 provides:

> For any violation of the provisions of this chapter the director of the insurance division may suspend or revoke the authority of any insurance carrier to do business in this state. If any insurance carrier fails or delays to pay any compensation finally determined to be due, the director shall hear the complaint, and if such failure is without reasonable excuse he may revoke or suspend the authority of such carrier to do business in this state, and in a proper case may apply for the appointment of a receiver for such carrier.

**36.** *See State ex rel. American Motorists Ins. Co. v. Ryan*, 755 S.W.2d 399, 400 (Mo.App. E.D. 1988).

**37.** *See Cebak*, 258 S.W.2d at 266.

**38.** *Cebak*, 258 S.W.2d at 266.

**39.** *Sutton*, 37 S.W.3d at 810.

RSMo provides warning to employers/insurers of the consequences of noncompliance and authorizes the Commission to enact those consequences for noncompliance. [The] employer/insurer have [sic] complied at times with the awards, but assessing the penalty of § 287.510 RSMo does not require that the employer/insurer completely not comply with the award.

Allied further argues that the Commission not only imposed a penalty improperly, but that it also miscalculated the penalty by including the second temporary award in the amount to be doubled. Allied submits that there was no noncompliance with the second temporary award. Based on our analysis in Allied's first point, this contention is without merit.

We turn now to the calculation of the award. In the final award issued on July 26, 1999, the total amount that had been paid under the temporary or partial award, as modified, included the medical expense of $29,454.84 and TTD compensation of $48,405.93, for a total of $77,860.77. At the time of the ALJ's final award, there was evidently no balance due Mr. Shaw because the payments were up to date. So, in doubling the amount of the temporary or partial award ($77,860.77) in the Commission's final award that was "final," which was in accordance with the temporary or partial award, the amount of the penalty comes to $77,860.77. Hence, the penalty was not miscalculated.

Point two is denied.

### Conclusion

After a thorough review of the record, the Commission's decision to penalize Allied for noncompliance is not against the logic of the circumstances and does not lack careful consideration. The Commis-sion's assessment of a $77,860.77 penalty against Allied is affirmed.

JOSEPH M. ELLIS, Judge, and RONALD R. HOLLIGER, Judge, concur.