Seri NEGRI, Claimant/Appellant/Cross–Respondent,

v.

CONTINENTAL SALES & SERVICE, Employer/Respondent/Cross–Appellant,

and

Travelers Indemnity Company of America, Insurer/Respondent/Cross–Appellant.

No. ED 82958.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 13, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 23, 2004.

Application for Transfer Denied Aug. 24, 2004.

Harry J. Nichols, St. Louis, MO, for appellant.

Jeffrey W. Knight, Catherine Vale Jochens, St. Louis, MO, for respondent.

LAWRENCE G. CRAHAN, Judge.

Appellant Seri Negri ("Claimant") appeals the final awards of the Labor and Industrial Relations Commission ("Commission") in two workers' compensation claims. Continental Sales and Service ("Employer") and its insurer Travelers Indemnity Company of America cross-appeal the same awards. We affirm in part and reverse and remand in part.

Claimant owned Continental Sales and Service which was in the business of installing and repairing industrial heating and cooling systems. Claimant was involved in two work-related accidents for which he claimed workers' compensation benefits. The first accident on September 18, 1988 was an injury to the right knee (# 88–177550). Claimant's right knee was pinned against a concrete wall while he was moving an ice cream machine. Claimant continued to work; however, five months after the injury he required arthroscopic surgery to repair a torn medial meniscus in that knee. He continued to have problems and in June, 1989, he underwent two additional surgeries. Claimant returned to work after those surgeries.

On October 8, 1990, Claimant was involved in a work-related automobile accident that strained his back (# 90–152835). He was treated with warm soaks in the tub. Claimant returned to work until March 1991. By that time his health had deteriorated to such a point that he was never able to return to work.

By December of 1992, the right knee had worsened to such an extent that Claimant underwent total knee replacement. He continued to have difficulty with the replacement and in 1994 had a second knee replacement. After the second knee replacement, it became infected and ultimately, in 1997 Claimant's right leg was amputated at the level of the knee. Claimant was fitted with a prosthesis and used crutches that were fitted with support rings around his forearms. During this period, Claimant suffered several falls at-

tributable to difficulties with the prosthesis and crutches. In one fall, he suffered a broken hip and required a complete hip replacement. Furthermore, use of the crutches irreparably damaged his shoulders and he was advised to use a motorized wheel chair. Claimant was also hospitalized for four months with an infection in his spine in 1999, the source of which is in dispute.

Claimant also has numerous pre-existing conditions unrelated to either of these claims. He had two lumbar laminectomies in the 1970's. He had a neck fusion in 1988. Claimant also suffers from osteoarthritis, scoliosis, a low-grade spondylosis, pseudogout and disc degeneration in his neck. He underwent gall bladder surgery in 1991 and open heart mitral valve replacement in 1992. Claimant's adrenal gland is also deficient which causes him to have generalized weakness.

The history of Claimant's workers' compensation claims is also lengthy. In April 1991, an Administrative Law Judge ("ALJ") denied the 1988 claim as Claimant was back to work but left it open for further consideration. In 1993, a different ALJ reopened the claim and awarded temporary total disability from March 1, 1991 until maximum medical improvement of the knee. On September 3, 1999, the ALJ found Employer liable for $14,000 worth of unpaid medical bills. The ALJ further found that Claimant was no longer capable of choosing his practitioners and that one doctor should be agreed upon to supervise his medical needs with regard to Claimant's amputated knee and any directly related condition substantially caused by the amputation of the knee. The parties chose Dr. Campbell. A final award for each of

the claims was issued on July 16, 2002 and was affirmed by the Commission.

The ALJ found Claimant permanently totally disabled from the 1988 injury to the knee combined with pre-existing injuries. This award also included payment of some medical bills, modifications of Claimant's home and a wheelchair accessible van. There was a separate award for the back injury of 1990 in which Claimant was awarded 5% permanent partial disability. It is from these final awards that both parties appeal. Claimant presents four points on appeal. Employer cross-appeals the award of the wheelchair accessible van.

■ When reviewing a decision by the Commission we will uphold the decision unless the Commission exceeded its authority; the award was procured by fraud; the award is unsubstantiated by the facts; or there is insufficient competent evidence to warrant the award. Section 287.495.1 RSMo 2000.[1] We examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, that is, whether the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003).

■ Claimant's first point argues the Commission erred in finding there was sufficient evidence that he was permanently totally disabled from the knee injury in 1988. Instead, Claimant asserts the back injury in 1990 in which the Commission awarded 5% permanent partial disability was the disabling injury. Claimant argues the 1990 injury led to the severe spinal infection and a four month hospitalization in 1999.[2] Thus, Claimant urges the 1990

1. All statutory references are to RSMo 2000 unless otherwise noted.

2. Claimant was hospitalized November 1999 through January 2000. He was in a nursing home in February 2000.

injury and not the knee injury is the disabling injury.

The ALJ meticulously stated the evidence used to support his decision. The case file documents a cascade of events leading to the total disability. Claimant injured his *left* knee, his rotator cuff, and spine in non-work-related injuries prior to the 1988 *right* knee injury. The weakness in the left knee caused Claimant to be unstable when using crutches. The additional strain of walking on crutches further injured his shoulders. The ALJ found that it was a combination of the right knee surgery complications and the pre-existing injuries that caused Claimant's total disability.

The 1990 injury was a minor sprain to his back and treatment was limited to heat packs. Claimant did not present any medical bills related to the treatment. There was no surgical intervention and Claimant returned to work after the injury. Two doctors testified about the 1990 injury and its causal relationship to the extended hospitalization for spinal infection in 1999. Dr. Lattinville testified the 1990 injury caused the 1999 infection. Dr. Campbell testified it was most likely caused by the lumbar surgeries in 1978. The ALJ found Dr. Campbell's testimony credible because he is a specialist in infectious diseases and the coordinator of Claimant's medical services. Further the ALJ found Dr. Lattinville's testimony not credible as there was no medical attention given to the back after the 1990 injury. Claimant's first point is denied.

■ Claimant's second point disputes the ALJ's denial of payment of a 1999 hospital bill for an infection of the spine. He claims the decision was not supported by the competent evidence. Questions regarding medical causation of an injury are issues of fact for the Commission, as are questions regarding medical treatment.

*Bock v. Broadway Ford Truck Sales, Inc.,* 55 S.W.3d 427, 438 (Mo.App.2001). The Commission is the sole judge of the weight of the evidence and credibility of the witnesses. *Id.* It is in the Commission's sole discretion to determine the weight to be given expert opinions. *Id.* This court does not reweigh evidence, rather, it determines as a matter of law whether the Commission could have reasonably made its findings and reached its result upon consideration of the evidence before it. *Hampton,* 121 S.W.3d at 223.

Dr. Campbell opined that the hospitalization resulted from "previous surgical interventions in his lumbar spine area" that occurred in 1978 prior to either of the work-related injuries. The ALJ found Dr. Campbell's opinion persuasive. Moreover, the ALJ had medical records as well as the testimony of two doctors who had been involved in caring for Claimant. Therefore, the ALJ had sufficient evidence to conclude the 1988 knee injury was not causally related to the 1999 spine infection. Claimant's second point is denied.

■ Claimant's third point questions the ALJ's denial of payment of the total pharmaceutical bill. He further insists that penalties should have been assessed for non-payment of the bill.

An employer has an obligation to provide medical care for an employee's work-related injuries. Section 287.140 provides: "In addition to all other compensation, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines as may reasonably be required after the injury or disability, to cure and relieve the effects of the injury."

The ALJ again relied on Dr. Campbell's testimony stating,

"Since Dr. Campbell distinguished between related drugs and non-related [in

his deposition], I find the Employer/Insurer not liable for the total drug bills. The Employer/Insurer is liable for only specific drugs as Dr. Campbell's testimony relates to this injury."

In this regard, the ALJ is free to choose which testimony he finds credible. *See Bock v. Broadway Ford Truck Sales, Inc.*, 55 S.W.3d 427, 438 (Mo.App.2001). The ALJ could reasonably have relied on testimony from the doctor assigned to coordinate care for Claimant.

 Claimant further insists in this point that penalties should be imposed as Employer did not make payment on all the medical bills. The question of assessing a penalty is a matter that is discretionary with the Commission, and we will not interfere unless it clearly appears that the action of the Commission was clearly arbitrary and constituted an abuse of that discretion. *Shaw v. Scott*, 49 S.W.3d 720, 725 (Mo.App.2001). We will deem the act an abuse of discretion if it is shown that the ruling is clearly against the logic of the circumstances, so arbitrary and unreasonable as to shock the sense of justice, and lacking careful consideration. *Id.*

Here the ALJ carefully considered the actions of the Employer and determined the Employer's reason for non-payment was legitimate. The ALJ stated:

> [We] do not find penalties in this case because the Employer has continued to pay TTD well beyond the 400 week maximum. In addition, they have paid for all of his surgeries and hospitalizations relating to his knee....Further, they started paying Mrs. Negri nursing care expenses ... at the time there was evidence of the need....They have legitimately questioned some medical expenses....

Claimant's third point is denied.

In his final point, Claimant argues the ALJ failed to award payment for addition-al nursing care in his home and that there was a mathematical error in the computations. Claimant relies on *Breckle v. Hawk's Nest, Inc.*, 42 S.W.3d 789 (Mo.App. 2001) to substantiate his point. That case is distinguishable from the case before us. In *Breckle*, the wife, a registered nurse, was providing nursing services for her husband and the insurance company was not paying her. She was providing services that could not have been provided by an untrained spouse. In this case, the wife is a clerical worker and according to her testimony has not provided services that would require specialized training. Claimant's wife testified that the insurance company began paying her $442.00 per week to care for her husband in 2000 after he was released from the nursing home. Prior to that time, a nurse came to the home for 50 hours per week so that wife could go to work. While the in-home nurse was provided, wife was paid to care for her husband from 6–10pm Monday through Friday and 16 hours for Saturday and 16 hours for Sunday.

Again in this point, Claimant questions the ALJ's calculation of hourly care. Mary Pecoraro and Vicki Essman, both registered nurses, testified to the number of hours and the fees that would be incurred. Essman reviewed Claimant's medical records for the previous thirteen years and calculated how many hours per day he would need assistance, how many days he was hospitalized in each year, how many days the insurance company had provided in-home care already, and what level of therapy he required after each of his illnesses or surgeries. She presented information from the Missouri Alliance for Home Health and the Long Term Care Ombudsman program regarding wages and salaries paid for the different levels of nursing he would have required. Pecoraro testified that Claimant needed 24–hour care, 7 days a week. She also estimated

the costs of live-in nursing care. Claimant submitted a report from the Alzhiemer's Association regarding the compensation for in-home care and the level of care needed in the current period. From the award, it appears the ALJ used both nurses' reports to gradate the level of pay from 1991 through 2002. There is substantial evidence in the file to support the number of hours of nursing care awarded as well as the amount of compensation.

However, the award contains a miscalculation for the year 2000. The award provides: "2000: Beginning of 1999[sic] provided residential nursing care recovery of heart trouble and discitis. ($15.00 an hour × 62 hours a week = $930 × 51 weeks) = $2440.00." The correction of the mathematical error results in a $44,990.00 underpayment.[3] Only the portion of Claimant's point relating to the mathematical error is granted.

 Employer's sole point on appeal disputes the award of full payment for a wheelchair accessible van. Employer argues that its portion of the award should be the difference between the cost of a midsize sedan and the modified van. Employer relies on *Mickey v. City Wide Maintenance*, 996 S.W.2d 144 (Mo.App. 1999). In *Mickey*, the court found that the cost of modification of a van, not the entire cost of the van, was a medical necessity. *Id.* at 152. The court reasoned that Mickey, a paraplegic, was risking further compensable injury by attempting to pull himself and his wheelchair into a vehicle. *Id.* at 151. It also reasoned that Mickey would have born the cost of a car had he not been injured and therefore the entire cost of the van should not rest on the employer. *Id.* at 152.

In this case, there is testimony from Claimant's wife that he drives a car specifically modified to accommodate his amputation. Dr. Margherita, who treats Claimant for his shoulder injuries, testified that Claimant should use a wheel chair accessible van to ensure that he does not further strain his shoulders. Dr. Margherita also testified that Claimant is not a candidate for shoulder replacement and therefore could further damage his arms if the strain is not alleviated.

Following the precedent in *Mickey*, it would be reasonable for the ALJ to award the modification of a van as a medical necessity. Had Claimant not been injured, there is sufficient evidence in the record that he would have purchased and driven his own vehicle. Thus, it seems reasonable that Employer in this case would only be liable for the cost of the difference between "an average, mid-price automobile of the same year as the purchased van ... [and] the cost of the converted van." *Id.* at 153. Employer's point on appeal is granted.

This case is reversed and remanded for amended findings as to 2000 nursing care costs and determination of the difference in the cost between an average, mid-price automobile of the same year as the purchased van and the cost of the converted van. In all other respects the awards are affirmed.

BOOKER T. SHAW. P.J., and PATRICIA L. COHEN, J., Concur.

---

**3.** $15.00 × 62 hours = $930 × 51 weeks = $47,4300. In its brief, Employer concedes that there is a computational error but claims the Commission should not have awarded 51 weeks for 2000. Employer did not appeal the number of weeks awarded and thus is not entitled to have this claim considered on appeal. *Biermann v. Gus Shaffar Ford, Inc.,* 805 S.W.2d 314, 325 (Mo.App.1991).