Jason RECTOR, Respondent,

v.

GARY'S HEATING & COOLING and
Federated Mutual Insurance
Company, Respondents,

and

Treasurer of the State of Missouri as
custodian of the Second Injury
Fund, Appellant.

Nos. SD 29641, SD 29643.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 28, 2009.

Timothy Michael McDuffey, Bergmanis & McDuffey, LLC, Camdenton, for Respondent, Jason Rector.

1. Employee filed two separate claims for compensation with the Commission. The cases had separate case numbers below and separate awards were issued, however, the matters were combined for purposes of the hearing in this matter. These cases have been consolidated for purposes of appeal to this Court.

Susan Turner & C. Travis Hargrove, Jefferson City, for Respondent, Gary's Heating & Cooling.

Chris Koster and Heather C. Rowe, for appellant.

**ROBERT S. BARNEY, Judge.**

Appellant, Treasurer of the State of Missouri as Custodian for the Second Injury Fund ("the Fund"), appeals from the Labor and Industrial Relations Commission's ("the Commission") "Final Award[s] Allowing Compensation (Affirming Award[s] and Decision[s] of Administrative Law Judge ['ALJ'])" ("the Final Awards") which awarded permanent total disability benefits to Jason Rector ("Employee") against the Fund following the second of two, work related injuries incurred by Employee.[1] In its sole point relied on, the Fund urges the ALJ erred in finding Employee "was permanently and totally disabled due to a combination of the two injuries rendering [the Fund] liable for ... benefits ..." because there "is not substantial and competent evidence to support the finding ... in that the evidence established either injury in isolation rendered [Employee] permanently and totally disabled."

Section 287.495.1 provides the standard of review for a workers' compensation case.[2] It sets out in relevant part:

[t]he court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

Additionally, Federated Mutual Insurance Company ("Insurer") joins Employer in this appeal as a Respondent. Employer and Insurer filed a single brief.

2. Unless otherwise stated, all statutory references are to RSMo 2000.

(1) That the [C]ommission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the [C]ommission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*See Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003).[3] "A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award...." *Id.* at 222–23. " '[T]he Commission, as the finder of fact, is free to believe or disbelieve any evidence,' and this [C]ourt is bound by the Commission's factual determinations." *Clark v. Harts Auto Repair,* 274 S.W.3d 612, 617 (Mo. App.2009) (quoting *ABB Power T & D Co. v. Kempker,* 236 S.W.3d 43, 49 (Mo.App. 2007)). " 'The Commission is the sole judge of the credibility of witnesses and the weight and value to give to the evidence.' " *Clayton v. Langco Tool & Plastics, Inc.,* 221 S.W.3d 490, 493 (Mo.App. 2007) (quoting *Blackwell v. Puritan–Bennett Corp.,* 901 S.W.2d 81, 85 (Mo.App. 1995)). Typically, this Court reviews the findings of the Commission; however, "[i]f the Commission incorporates the [ALJ's] opinion and decision, the reviewing court will consider the Commission's decisions as including those of the [ALJ]." *Copeland v. Thurman Stout, Inc.,* 204 S.W.3d 737, 740

(Mo.App.2006). "The Commission's interpretation and application of the law ... are not binding on this [C]ourt and fall within our realm of independent review and correction." *Bowers v. Hiland Dairy Co.,* 132 S.W.3d 260, 263 (Mo.App.2004).

"Section 287.220.1 sets out the law governing when the second injury fund is liable." *Pierson v. Treas. of Missouri,* 126 S.W.3d 386, 388 (Mo. banc 2004).

It provides for fund liability if the preexisting disability and the combined effect of it and the new injury are each of such seriousness that they are a hindrance or obstacle to employment and 'if a body as a whole injury, equals a minimum of fifty weeks of compensation or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability.'

*Id.* at 388–89 (quoting § 287.220.1). "Where the statute applies, the employer is liable only for the amount of disability caused by the current injury, and the fund is liable in the amount of the increase in disability caused by the synergistic effect of the two injuries." *Id.*

The record reveals that on September 24, 2004, Employee was injured while in the course and scope of his employment with Gary's Heating & Cooling ("Employer").[4] On that date, Employee was on a ladder drilling a hole in a joist when the ladder slipped out from under him and he "slid" to the floor on the ladder. Employee landed on his right side and immediate-

---

3. We note several cases overruled by *Hampton* are cited in this opinion in support of other principles of law not affected by the *Hampton* ruling. *Hampton,* 121 S.W.3d at 224–32. No further acknowledgment of *Hampton's* effect on those cases needs to be recited hereafter.

4. Employee was employed as a supervisor where he supervised the activities of several other men on a daily basis. His primary responsibility was to oversee Employer's vari-

ous jobs by making sure all the work was done according to the correct building codes and that work was completed in a timely manner. He typically worked forty hours per week from 8:00 a.m. to 4:30 p.m., Monday through Friday. As part of his employment, Employee had to be able to lift various things on a daily basis including ductwork, his fifty pound tool box, his twenty pound tool belt, and other fairly heavy items.

ly began experiencing pain in his right hand, foot, and elbow. Employee was taken to the hospital by a co-worker where he was given x-rays which showed no fractured bones and was told to take pain killers to regulate his pain.[5]

Employee saw his family physician, Dr. Mark Jones ("Dr. Jones"), on October 22, 2004, due to a stiff neck and back pain. Dr. Jones diagnosed Employee with strain and muscle spasms in his back and recommended physical therapy in addition to pain medication.

Employee continued to work part-time for Employer after the September accident. Although he no longer carried heavy items while at work, including his toolbox, he continued to supervise other workers. He also had to increase the amount of pain medication he was taking such that he was sometimes taking eight Hydrocodone pills per day and by February of 2005 he was taking 100 milligrams of Oxycontin per day.

In February of 2005, Employee spent several days drilling a hole through a concrete wall. On February 18, 2005, the day after completing the drilling project, Employee awoke with swelling, pain, numbness, and tingling in his arms and hands. Employee also experienced a loss of sensation in those areas and was unable to make a fist. Employee alerted Employer and was told to go to the emergency room. The treating physician in the emergency room was unsure if the source of his pain

was related to his accident in September of 2004 or not.[6]

Employee never returned to work for Employer and has not been employed since that time. As a result of the aforementioned work related accidents, Employee must sleep in his recliner because he cannot lie flat on his bed, cannot stand for long periods of time without extreme pain, has difficulty sleeping, and can no longer enjoy activities he formerly engaged in, such as; wrestling with his children, playing golf, riding his jet ski, playing paintball, and playing the drums. Additionally, at the time of the hearing in this matter Employee was taking the following prescriptions on a daily basis: a 75 milligram Fentanyl patch which he changes every forty-eight hours; five Lorcets; and three, ten milligram Amitriptyline.

A hearing was held in relation to both of Employee's pending claims for compensation. Following the hearing, on August 22, 2008, the ALJ issued separate awards as to each claim for compensation.

Regarding the September of 2004 accident, the ALJ found Employee "sustained a permanent disability of 65 [percent] of the body as the result of his neck and back injury of September 24, 2004;" however, Employee did not meet his burden of proving "he has a combined disability sufficient to invoke [the Fund's liability] for permanent partial disability."

Regarding the February of 2005 injury, the ALJ found Employee met his burden

5. There was testimony in the record that prior to this work related accident Employee had suffered for numerous years from intermittent neck, back, arm and bilateral wrist problems in addition to numbness in his extremities. In 1999, following a car accident, Employee was diagnosed with degenerative disc disease with possible nerve impingement; lumbar disc disease; lumbar muscle spasms; and os-

teoarthritis of the lumbar spine. Employee's medical records show he was treated often for such back and neck complaints with pain medicine and therapy.

6. It is undisputed that Employee was acting in the course and scope of his employment at the time of both the September of 2004 and the February of 2005 accidents.

of proving "he has sustained a permanent disability of 25 percent of each upper extremity at the level of the elbow as the result of occupational disease. . . ." The ALJ stated that because he "was able to work subsequent to his September 24, 2004, back injury and it was not until the February 17, 2005[,] occupational disease caused him to seek treatment and further limit his activities that [Employee] found himself unable to work." Accordingly, the ALJ found the Fund "liable for permanent total disability benefits."

The Fund filed its "Application[s] for Review" with the Commission on September 5, 2008, and September 9, 2008. On January 23, 2009, the Commission issued the Final Awards which incorporated and affirmed the findings of the ALJ.

■ In its appeal, the Fund now argues there was evidence that "either injury in isolation rendered [Employee] permanently and totally disabled" such that the Fund is not liable for paying permanent total disability payments to Employee. We disagree.

■ Section 287.020.7, RSMo Cum. Supp.2005, states that "[t]he term 'total disability' . . . shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident."

> The test for determining whether a claimant is permanently and totally disabled is whether: 'given the claimant's situation and condition, he is competent to compete in the open market. The central question is whether in the ordinary course of business, an employer would reasonably be expected to hire the claimant in his present physical or mental condition reasonably expecting him to perform the work for which he is hired.'

*Baxi v. United Tech. Auto.,* 956 S.W.2d 340, 343 (Mo.App.1997) (quoting *Grgic v. P & G Constr.,* 904 S.W.2d 464, 466 (Mo.App. 1995)). "This test measures the worker's prospects for returning to employment." *Brown v. Treas. of Missouri,* 795 S.W.2d 479, 483 (Mo.App.1990). "The burden of establishing permanent total disability lies with the claimant." *Mell v. Biebel Bros., Inc.,* 247 S.W.3d 26, 29 (Mo.App.2008).

Therefore, the only issue raised here is whether there was substantial and competent evidence to support the Commission's finding that Employee was permanently and totally disabled due to the combination of injuries he suffered as the result of the September of 2004 and February of 2005 work related accidents.

Here, following the September of 2004 accident, Employee visited the emergency room for treatment and then did not seek further medical treatment until the following month when he visited his family physician, Dr. Jones. His problems related to the accident included a stiff neck, back problems, vertebral disc issues, and an aggravation of his degenerative disc disease. Employee returned to work with the aid of medication and with diligent observation of the restrictions placed on him by his physicians. He continued working as a supervisor on a part-time basis as he had done previously.

Additionally, Dr. Jeffrey Parker ("Dr. Parker"), an orthopedic surgeon, felt that in relation to the September of 2004 accident Employee was at maximum medical improvement for his neck and back problems in October of 2005 and ultimately concluded that the September of 2004 accident gave him a disability rating of 10 percent of the body as a whole due to the strains in his back and neck. Further, Dr. David Volarich ("Dr. Volarich"), who performed an independent medical evaluation on Employee, found that as a result of the

September of 2004 accident Employee had the following disability ratings: 20 percent of the body as a whole due to disc protrusions at C4–5 and C5–6; 15 percent of the body as a whole due to disc protrusion at T8–9; 22.5 percent of the body as a whole due to disc protrusions at L3–4 and L4–5 in addition to aggravation of his degenerative disc disease; and 25 percent of the body as a whole due to severe myofascial and chronic regional pain syndrome in his torso, shoulders, and hips. He also testified that he did not believe Employee was totally disabled due to the September of 2004 accident, but he related he would defer to a vocational expert on that issue. The only person to testify that Employee was totally and permanently disabled by the September of 2004 accident in and of itself was Mr. Wilbur Swearingin ("Mr. Swearingin"), Employee's vocational expert. However, we discern that in its Final Award, the Commission found Mr. Swearingin's testimony to be less than credible. The Commission noted, "Mr. Swearingin found that either the back or the hand injuries could have caused [Employee's] permanent total disability, however [Employee] was able to work subsequent to his September 24, 2004[,] back injury and it was not until the February 17, 2005[,] occupational disease caused him to seek treatment and further limit his activities that [Employee] found himself unable to work." " 'It is in the Commission's sole discretion to determine the weight to be given expert opinions.' The Commission as fact finder may reject all or part of an expert's testimony.' " *Russell v. Invensys Cooking & Refrigeration*, 174 S.W.3d 15, 25 (Mo.App.2005) (quoting *Negri v. Continental Sales & Serv.*, 139 S.W.3d 565, 569 (Mo.App.2004)).

Here, there is sufficient evidence to support the Commission's finding that Employee "sustained a permanent disability of 65 [percent] of the body as the result of his neck and back injury of September 24, 2004" and that at that time "there [was] no evidence that the combination of the September 24, 2004[,] accident … and [his] preexisting disability [of back and neck problems] rendered [Employee] permanently and totally disabled."

We now turn to the February of 2005 injury, which caused injuries to Employee's hands and arms. After this injury, Employee was unable to return to work for Employer or seek employment of any kind. Dr. Scott Swango ("Dr. Swango"), a hand specialist, testified that Employee was at maximum medical improvement from those injuries in November of 2006. He indicated Claimant needed no further treatment for his injuries and had a permanent partial disability of 13 percent to each hand as a result of the February of 2005 injury. Further, Dr. Volarich rated Employee's injuries from the February of 2005 injury as follows: a 35 percent disability to each wrist due to carpal tunnel syndrome; a 15 percent disability to the left elbow due to cubital tunnel syndrome; and a 15 percent multiplicity factor due to the combination of these injuries and his previous upper extremity injuries. Dr. Volarich was not of the view that Employee was permanently and totally disabled *solely* as the result of the February of 2005 injury. Additionally, the only testimony that Employee was totally and permanently disabled by the February of 2005 injury alone was the testimony of Mr. Swearingin, which we discern was discounted by the Commission in its Final Awards.[7] As previously related, such de-

---

7. It is worth noting that the Fund's vocational expert, Mr. James England ("Mr. England"), testified that neither the September of 2004 accident nor the February of 2005 injury was sufficient to render Employee either partially disabled or totally disabled.

terminations relating to the credibility of expert witnesses is the province of the Commission and not this Court. *See Russell,* 174 S.W.3d at 25. " 'It is in the Commission's sole discretion to determine the weight to be given expert opinions.' " *Id.* (quoting *Negri,* 139 S.W.3d at 569). There was sufficient evidence elicited showing that Employee suffered but a permanent partial disability as a result of the February of 2005 injury.

It is also clear there was substantial and competent evidence supporting the Commission's finding that Employee "sustained his burden of proof that he was permanently and totally disabled as the result of the combination of his bilateral upper extremity injuries combined with his preexisting disability to his back."

There was testimony from Employee about his inability to stand for prolonged periods of time; his difficulties with fine motor skills involving his hands; his need to recline and lie down often during the day; his dependence on pain medicine to complete normal tasks; and the changes in his personal lifestyle as a result of his work related injuries. Dr. Swango offered no opinion on Employee's ability to find employment in the open labor market, but he did conclude that due to his symptoms Employee would have "great difficulty" in performing a job which required hard manual labor. Further, as the Commission found, Dr. Volarich "testified that [Employee's] disability is . . . the result of the combination of his back and wrist injuries." Dr. Volarich noted that Employee had a number of physical restrictions to his ability to find employment and that "[i]f vocational assessment is unable to identify a job for which [Employee] is suited, then it is [his] opinion that [Employee] is permanently and totally disabled as a direct result of the work related injuries. . . ." Additionally, Mr. England felt

that Employee was unemployable in the open labor market if he abided by the restrictions placed on him by Dr. Volarich which required him to recline throughout the day. There was substantial and competent evidence presented to support the Final Awards of the Commission. Point denied.

The Final Awards of the Commission are affirmed.

BATES, P.J., and BURRELL, J., concur.