Stancie MOLDER, Respondent,

v.

MISSOURI STATE TREASURER, as
Custodian of the Second Injury
Fund, Appellant.

No. WD 72977.

Missouri Court of Appeals,
Western District.

June 14, 2011.

Kimberly C. Fournier, Kansas City, MO, for appellant.

James W. Humphrey, Jr. and John R. Humphrey, Kansas City, MO, for respondent.

Before: GARY D. WITT, P.J., and JAMES EDWARD WELSH and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

The Second Injury Fund appeals the Labor and Industrial Relations Commission's Final Award Allowing Compensation, which found that preexisting injuries and a primary carpal tunnel injury combined to render claimant Stancie Molder permanently and totally disabled. The Fund argues that the overwhelming weight of the competent evidence establishes that Molder was employable in the open labor market, and therefore was not permanently and totally disabled. We affirm.

## Factual Background

Molder began working at Bank of America as a data entry processor in 1991, and remained employed in that position until she was laid off in 2007. Molder began suffering from numbness and tingling in both hands in 2002. She was diagnosed with the primary work-related injury of

bilateral carpal tunnel syndrome caused by repetitive stress. In October 2006 and November 2007, Molder underwent right and left carpal tunnel release procedures. She testified that, despite the surgeries, her symptoms of weakness and cramping in her hands and wrists had not improved, and may have gotten worse.

Molder settled her claim against Bank of America for her primary carpal tunnel injury in a Stipulation for Compromise Settlement approved on December 17, 2008. The settlement rated Molder's carpal tunnel injury as causing a 12.5% permanent partial disability to her body as a whole.

In addition to her claim against Bank of America, Molder also asserted a claim against the Second Injury Fund, alleging that her primary carpal tunnel injury combined with preexisting injuries to render her permanently and totally disabled. The evidence indicated that Molder had suffered a series of serious injuries prior to the onset of bilateral carpal tunnel syndrome in 2002. In 1987 she injured her low back in a car accident, requiring spinal surgery. As a result of the 1987 back injury, Molder was subject to a 25–pound permanent lifting restriction, as well as limitations on her ability to sit for extended periods, bend at the waist, push, pull, twist, and lift and carry objects.

Molder injured her right foot while working at Wal–Mart in 1994, when a shopping cart ran into the back of her heel. She had two surgeries to address the injury, but nevertheless continued to experience persistent pain both in her forefoot, and in her heel. The pain prevented Molder from standing or walking for more than one hour. Molder was on medical leave from Wal–Mart for a full year due to the injury and resulting pain.

Molder injured her right shoulder in December 2000, when she fell in an icy parking lot while leaving work. Molder tore her rotator cuff and injured her brachial plexus as a result of the fall. She had surgery on her right shoulder in January 2001. Molder testified that she "was off work for almost six months ... because of the surgery." The injury caused ongoing weakness and pain in Molder's right shoulder, and prevents her from performing overhead activities on the right side, and from lifting items greater than fifteen or twenty pounds. The December 2000 fall also caused an increase in the pain Molder experienced in her lower back.

Following her layoff by Bank of America in 2007, through the date of the administrative hearing, Molder worked part-time at Burch Automotive. She testified that she works four hours a day, typically one day a week on an as-needed basis, taking telephone messages and performing other light work. Despite her ongoing employment at Burch Automotive, Molder alleged that the combination of her preexisting injuries and the 2002 carpal tunnel injury rendered her permanently and totally disabled.

After a hearing in November 2009, the Administrative Law Judge rejected Molder's claim against the Fund for permanent and total disability benefits. The ALJ concluded that, because "Ms. Molder is currently performing work on the open labor market, albeit part time, ... she must be considered employable on the open labor market." The ALJ instead awarded Molder permanent partial disability benefits of $8,777.73 from the Fund.

Molder applied for review to the Labor and Industrial Relations Commission. In a Final Award entered on August 25, 2010, the Commission concluded that the ALJ had misapplied the law, and that Molder was in fact permanently and totally disabled.

[E]mployee sporadically performs part-time work for Burch Automotive on an as-needed basis. Employee works zero to twenty hours a week. Employee has the option of not reporting to work if she is having a bad day. Burch Automotive accommodates employee by allowing employee to alternate between sitting, standing, and reclining to elevate her feet so long as there are no customers presents. This irregular work is not employment in the open labor market.

More importantly, the uncontradicted opinions of three credible experts are in agreement that no reasonable employer could be expected to hire employee in her current condition.

The Commission awarded Molder permanent total disability benefits from the Fund. In addition to other relief, the Commission ordered the Fund to pay Molder $290.29 per week for her lifetime, beginning on March 25, 2009. The Second Injury Fund appeals.

## Standard of Review

 In workers' compensation cases,

a court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1) That the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

*Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003) (citation and internal quotation marks omitted).[1]

 While we review questions of law *de novo*, *see, e.g.*, *McGhee v. W.R. Grace & Co.*, 312 S.W.3d 447, 451 (Mo.App. S.D. 2010), whether a particular employee is permanently and totally disabled is a factual, not a legal, question. "[O]ur inquiry into permanent-total disability is a factual one: whether Claimant is employable. We will not substitute our judgment on issues of fact where the Commission was within its powers, even if we would arrive at a different initial conclusion." *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 210 (Mo. App. E.D.1999); *see also Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 234 (Mo. App. S.D.2003) ("The extent and percentage of disability is a finding of fact within the special province of the Industrial Commission." (citation and internal quotation marks omitted)); *Shipp v. Treasurer*, 99 S.W.3d 44, 51 (Mo.App. E.D.2003).

 To determine whether there is sufficient competent and substantial evidence to support the Commission's award, we examine the evidence in the context of the whole record. *Hampton*, 121 S.W.3d at 222–23. "The Commission, as the finder of fact, is free to believe or disbelieve any evidence. We defer to the Commission's findings as to weight and credibility of testimony and are bound by its factual determinations." *ABB Power T & D Co. v. Kempker*, 236 S.W.3d 43, 49 (Mo.App. W.D.2007) (citations omitted).

## Analysis[2]

The Fund argues in its sole Point Relied On that "[t]he Commission erred in revers-

---

1. In clarifying the proper standard of review, *Hampton* overruled a large number of prior decisions on this discrete point. *See* 121 S.W.3d at 223, 224–32. We cite such cases in this opinion for legal propositions unrelated to the standard of review, without further notation.

2. At the outset, we note that both the Fund and Molder apparently agree that, due to the date of initial onset of Molder's occupational

ing the Administrative Law Judge's award finding that Ms. Molder was employable in the open labor market," because—according to the Fund—substantial evidence supported the ALJ's decision.

■ The Fund's Point Relied On—which argues that the Commission erred *in rejecting the ALJ's decision*—misconceives the nature of our judicial review in workers' compensation cases. The Labor and Industrial Relations Commission does not owe any deference to the decisions of its ALJs. To the contrary, § 287.480.1, RSMo 2000 gives the Commission plenary authority to make an award in any case properly brought before it. It specifies:

> If an application for review is made to the commission within twenty days from the date of the award, the full commission, if the first hearing was not held before the full commission, shall review the evidence, or, if considered advisable, as soon as practicable hear the parties at issue, their representatives and witnesses and shall make an award and file it in like manner as specified in section 287.470.

Thus, where the Commission reviews an ALJ's decision, it essentially considers the issues *de novo*.[3] Reviewing courts have emphasized that the Commission is not bound to follow the ALJ's decision, even concerning the assessment of witness cred-

ibility, but is entitled to reach its own conclusions. For example, the court in *Garrett v. Treasurer*, 215 S.W.3d 244 (Mo. App. S.D.2007), rejected a claimant's argument that "the Commission 'capriciously disregarded' the ALJ's findings," *id.* at 247—the same claim the Fund asserts here. While *Garrett* held that the Commission should give due regard to the ALJ's credibility determinations, the court emphasized that the Commission owed the ALJ's determinations no deference, and was authorized to reach its own independent conclusions:

> We agree the Commission should duly consider an ALJ's credibility determinations, and should articulate any reasons for differing therefrom as an aid to judicial review. Yet the Commission need not defer to ALJ findings, credibility or otherwise, but is authorized to reach its own decisions.

*Id.* (citation omitted); *see also Gibson–Knox v. Classic Print*, 184 S.W.3d 201, 204 (Mo.App. S.D.2006); *Kent v. Goodyear Tire & Rubber Co.*, 147 S.W.3d 865, 871 (Mo.App. W.D.2004).

■ Because the Labor and Industrial Relations Commission is the ultimate decision-maker in workers' compensation cases, it is black-letter law that, on judicial review, "[w]e review the findings of the Commission and not those of the ALJ."

---

disease, her claim is governed by the Workers' Compensation Law as it existed prior to the 2005 amendments to the Law. Under the pre–2005 statute, " '[a]ny doubt as to the right of an employee to compensation should be resolved in favor of the injured employee.' " *Angus v. Second Injury Fund*, 328 S.W.3d 294, 297–98 (Mo.App. W.D.2010) (quoting *Schoemehl v. Treasurer*, 217 S.W.3d 900, 901 (Mo. banc 2007)).

3. *See, e.g., Herschel v. Nixon*, 332 S.W.3d 129, 132 n. 3 (Mo.App. W.D.2010) ("Although administrative law judges may be vested, as an initial matter, with many of the powers of the

Division [of Workers' Compensation] and the Labor and Industrial Relations Commission, see § 287.610.6, their decisions are subject to *de novo* review by the Labor and Industrial Relations Commission, consistent with the Commission's role as 'the ultimate trier of fact' in workers' compensation proceedings." (citation omitted)); *Shaw v. Scott*, 49 S.W.3d 720, 728 (Mo.App. W.D.2001) ("Review by the Commission results in a modified trial *de novo.* ... The Commission reviews the record, and ... reach[es] its own conclusions on factual issues *independent* of the ALJ." (footnote omitted)).

*Lingo v. Midwest Block and Brick, Inc.,* 307 S.W.3d 233, 235 (Mo.App. W.D.2010). Thus, whether there was substantial evidence supporting *the ALJ's decision* is not the relevant question—we must instead determine if there was substantial evidence supporting *the decision reached by the Commission,* even if the evidence would have *also* supported the opposite result. *See, e.g., Gregory v. Detroit Tool & Eng'g,* 266 S.W.3d 844, 846 (Mo.App. S.D. 2008) ("Certainly there was sufficient evidence to support the ALJ's determination, but the Commission is not bound or obligated to yield thereto. . . . [O]ur standard of review compels us to defer to the Commission's credibility decision when, as here, there is competent and substantial evidence both ways."; citing *Garrett* ).

 Turning to the merits, the Workers' Compensation Law provides that "[t]he term 'total disability' . . . shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident." § 287.020.7, RSMo 2000.

> The test for permanent total disability is whether the worker is able to compete in the open labor market. The critical question is whether, in the ordinary course of business, any employer reasonably would be expected to hire the injured worker, given his present physical condition.

*Treasurer v. Cook,* 323 S.W.3d 105, 110 (Mo.App. W.D.2010) (citations and internal quotation marks omitted); *see also, e.g., Houston v. Roadway Express, Inc.,* 133 S.W.3d 173, 178 (Mo.App. S.D.2004).

In this case, competent and substantial evidence supports the Commission's determination that Molder's preexisting disabilities and her primary work injury combined to render her permanently and totally disabled. Dr. Brent P. Koprivica,

M.D., testified as a medical expert on Molder's behalf. Dr. Koprivica described Molder's preexisting injuries, and opined that, as a result of those earlier injuries, "Ms. Molder had significant industrial disability." Dr. Koprivica concluded that Molder had sustained a 12.5% permanent partial disability to the body as a whole due to her 1987 back injury, a 15% permanent partial disability of the right foot at the level of the ankle due to the 1994 incident, and a 27% permanent partial disability of the right upper extremity at the level of the shoulder due to her December 2000 fall. Dr. Koprivica testified that, due to her carpal tunnel syndrome and resulting surgeries, Molder had experienced a further 12.5% permanent partial disability to the body as a whole. As a result of Molder's multiple injuries, Dr. Koprivica opined that she should be restricted from repetitive hand use (including extensive typing), repetitive pinching or grasping, squatting, crawling, kneeling, climbing, sitting, standing, walking for more than one hour, engaging in activities above the right shoulder, and repetitive reaching activities using the right upper extremity. Dr. Koprivica testified that Molder was "permanently totally disabled . . . [because] she cannot access the open labor market and that it would be unrealistic to believe that any ordinary employer could accommodate the restrictions that were necessary from her multiple disabilities."

Dr. James Stuckmeyer, M.D., also testified on Molder's behalf as a medical expert. Dr. Stuckmeyer testified that he assessed Molder with: (1) "a 20 percent permanent partial disability to the right wrist . . . [and] left wrist"; (2) "a 20 percent preexisting disability to the lumbar spine" resulting from the 1987 car accident; (3) "a preexisting 30 percent disability to the right shoulder, with an additional

10 percent for the diagnosis of bronchial plexopathy"; and (4) a "preexisting 12.5 percent disability to the cervical spine for symptoms consistent with chronic cervical strain and posterior myofascial syndrome." Dr. Stuckmeyer also stated that Molder suffered from symptoms consistent with tennis elbow because of "the repetitive nature of her occupational duties" at Bank of America, and thus assessed a five percent disability for the left and right elbows. Dr. Stuckmeyer recommended restrictions limiting Molder's pushing, pulling, lifting, prolonged standing or walking, and repetitive traversing of steps, bending, and torsional stress. Finally, Dr. Stuckmeyer also recommended a vocational evaluation and concluded in his written report that, "if the vocational expert does not believe that there is any meaningful gainful employment available to Ms. Molder, then it would be my opinion that she is permanently and totally disabled."

Bud Langston, a vocational expert, reviewed Molder's medical records and administered four different vocational tests. Considering the restrictions imposed by Drs. Koprivica and Stuckmeyer, and "given [Molder's] presentation as it is now, using her age, education, training, capacity for further rehabilitation and re-education," Langston testified "that it is not likely that any reasonable employer in the usual course of business would hire Ms. Molder to perform . . . [an] open labor market position." As a result, he opined that Molder was "permanently, totally disabled."

The evidence described above supports the Commission's determination that the restrictions on Molder's activities due to her pre-existing injuries, combined with her primary work-related carpal tunnel injury, would prevent any reasonable employer in the ordinary course of business from hiring her. Substantial evidence thus supports the Commission's determination that Molder is permanently and totally disabled.

As the Commission properly recognized, Molder's limited, highly accommodated employment with Burch Automotive did not preclude a finding that she was permanently and totally disabled.[4] Missouri courts have made clear that the Commission is not prevented from finding that a claimant is permanently and totally disabled simply because he or she holds limited, sporadic and/or highly accommodated employment. "Certainly the ability to perform some work is relevant to th[e] [total disability] determination, but it is not dispositive. To the contrary, a number of cases have recognized that a claimant can be totally disabled even if able to perform sporadic or light duty work." *Cooper v. Med. Ctr. of Indep.,* 955 S.W.2d 570, 575 (Mo.App. W.D.1997).

> Cases in this area specifically state that neither the worker's ability to engage in occasional or light duty work nor the worker's good fortune in obtaining work other than through competition on the open labor market should disqualify the worker from receiving . . . total disability benefits under the Workers' Compensation Law.

*Minnick v. So. Metro Fire Prot. Dist.,* 926 S.W.2d 906, 910 (Mo.App. W.D.1996) (dictum).

Thus, *Pavia v. Smitty's Supermarket,* 118 S.W.3d 228 (Mo.App. S.D.2003), held that the Commission was not "automatically preclude[d]" from determining that a

---

4. Because the Commission only found Molder to be entitled to permanent total disability benefits as of April 10, 2008, the day after it determined that she had reached maximum medical improvement for her primary injury following her bilateral carpal tunnel release surgeries, we do not consider her employment for Bank of America or other employers prior to that time to be particularly probative of her level of disability.

claimant was permanently and totally disabled simply because the "Claimant had a job performing a variety of small tasks with the auto dealership at the time of the hearing." *Id.* at 238. The court emphasized that "total disability means the inability to return to any reasonable employment. It does not require that the claimant be completely inactive or inert." *Id.* (citations and internal quotations marks omitted).

Likewise, the Eastern District held that "a claimant who is found by the commission to be 'only able to work very limited hours at rudimentary tasks' is a totally disabled worker." *Grgic v. P & G Const.,* 904 S.W.2d 464, 466 (Mo.App. E.D.1995). There, the claimant was *"sometimes"* able to work for a few hours a day but quickly became tired. *Id.* The court concluded that "[t]his limited activity does not mitigate against a finding of total disability. The fact that claimant *sometimes* can work a few hours a day serves only to highlight his inability to work a regular schedule, which is a hallmark of 'odd-lot' total disability." *Id.* (citation and internal quotations marks omitted). "To hold these attempts at rudimentary tasks against" the claimant " 'would tend to encourage idleness on the part of injured employees and discourage them from making efforts to help themselves for fear that any activity on their part might furnish evidence against their right to the compensation which the law has provided for them.'" *Id.* (citation omitted).

Finally, *Gordon v. Tri–State Motor Transit Co.,* 908 S.W.2d 849, 853–54 (Mo. App. S.D.1995), affirmed the Commission's permanent total disability determination even though the claimant testified that he was able to perform multiple physical tasks since his accident, such as mowing his yard, helping install siding and cabinets on and in his house, completing body work and maintenance on his car, and even op-erating a backhoe for short periods of time. The claimant testified that "all of these activities were uncomfortable, could be performed for only short periods, and took extended time to complete." *Id.* at 854. The court concluded that substantial evidence supported the Commission's finding that a claimant "does not have to be bedridden, in a wheelchair or inert to be declared permanently and totally disabled," and that, "given claimant['s] age, education and physical condition, no employer could be expected to employ him." *Id.*

Here, the evidence supported the Commission's determination that Molder's part-time position at Burch Automotive did not constitute employment in the open labor market. Molder procured the Burch Automotive position through her daughter, who knew the owner. Molder testified that the job consisted of "light work, telephone, taking messages and things like that." She worked "whenever the [owner] needs [her]," but usually only on Wednesday, and only for four hours at a time. Molder's daughter testified that after her shift, Molder would come over to her daughter's house and "take a pain pill and . . . fall asleep on the couch," and that in the evening it was like she did not "have the strength to go home."

Molder's vocational expert (Langston) specifically testified that her part-time work with Burch Automotive was not representative of employment in the open labor market because of the numerous, substantial accommodations made by the employer to allow for Molder's physical limitations:

> [The Burch Automotive position] was highly accommodated to meet her specific needs in that she is able to sit and stand as she needs to. She even elevates her foot as long as there's not customers. She will recline back in the office chair, putting her foot up so that

she can decrease the swelling and reduce pain in her foot. . . . Also, if she's having a bad day and she doesn't show up, it will not put her employment in jeopardy.

Langston also noted that the employer made special arrangements when Molder was delivering a part, to insure that she did no lifting; "normally th[e] person that delivers that would be required to do some of that type of [lifting] work." [5]

Molder's limited, sporadic, and highly accommodated position at Burch Automotive did not require the Commission to find that she was employable in the open job market. The Commission could properly find on this record that the accommodations made by Burch Automotive are not the characteristics of "reasonable employment," and do not reflect employment in the open labor market. *Pavia*, 118 S.W.3d at 238. Indeed, the fact that Molder worked for Burch only sporadically, and for limited periods, confirms her inability to work a regular schedule, "a hallmark of 'odd-lot' total disability." *Grgic*, 904 S.W.2d at 466. In addition, the wages from this employment were unlikely to meet Molder's most basic needs. The Commission did not err in finding Molder permanently and totally disabled, despite her employment at Burch Automotive.

The Fund cites *Rector v. Gary's Heating Cooling*, 293 S.W.3d 143 (Mo.App. S.D. 2009), and argues that because Molder was working part-time at the time of the administrative hearing, we *must* consider her to be employable in the open labor market, and therefore ineligible for permanent and total disability benefits as a matter of law. But in *Rector*, the Southern District affirmed a decision of the Commission which found—*as a factual matter*—that a claimant was not permanently and totally disabled as a result of a 2004 workplace accident, but only became so following a further 2005 injury. The claimant in that case had continued to work for the employer as a supervisor on a part-time basis, with certain accommodations, following the 2004 incident. *Id.* at 146. *Rector*'s affirmance of a factual determination by the Commission does not establish a hard-and-fast rule that *any* post-injury employment, no matter how limited in scope or how substantially an employee is accommodated, necessarily precludes a finding of permanent total disability. *See Gordon*, 908 S.W.2d at 854 (distinguishing *Massengill v. Ozark Action, Inc.*, 762 S.W.2d 850 (Mo.App. S.D. 1989), which affirmed a Commission finding of no permanent and total disability based on the claimant's occasional post-accident employment). We also note that in *Rector*, two medical experts opined that the claimant was *not* permanently and totally disabled as a result of the 2004 accident, *see* 293 S.W.3d at 147–48, while here, three experts the Commission found credible were in agreement concerning Molder's permanent and total disability. *Rector* does not require reversal.

### Conclusion

The Commission's Final Award Allowing Compensation is affirmed.

All concur.

---

**5.** Langston acknowledged, in response to questioning by the Fund's counsel, that *individual tasks* Molder performed for Burch Automotive (such as answering telephones and sorting mail), are tasks performed in various jobs in the open labor market. Despite this acknowledgment, the Commission was entitled to find that the conditions of employment under which Molder performed these tasks were highly unusual, and not representative of a typical employment relationship.