Larry UNDERWOOD, Claimant–
Respondent,

v.

HIGH ROAD INDUSTRIES, LLC,
Employer–Appellant.

No. SD 31731.

Missouri Court of Appeals,
Southern District,
Division Two.

June 14, 2012.

Joseph R. Ebbert, Kansas City, MO, for Appellant.

John Wise, Springfield, MO, for Respondent.

**WILLIAM W. FRANCIS, JR., P.J.**

High Road Industries, LLC ("High Road")[1] appeals the "Final Award Allowing Compensation" ("Award") of the Labor and Industrial Relations Commission ("Commission") finding Larry Underwood ("Underwood") permanently and totally disabled. We affirm the decision of the Commission.

### Factual and Procedural History

Underwood was born on June 22, 1959, and was 51 years old at the time of the Award. Underwood has limited educational background and work history. Underwood completed the tenth grade, but never obtained a GED because pre-screening tests indicated he would need significant remedial instruction and he did not believe he could accomplish such remedial education. Underwood's only formal vocational training was as a diesel mechanic in the U.S. Army.

From 1977 through 1983, Underwood served in the U.S. Army as a diesel mechanic and obtained an honorable discharge. From 1983 through 1999, Underwood worked as a truck mechanic and local delivery driver in Florida. In 1999, Underwood moved to Missouri and began employment as a mechanic at High Road in Branson. From 2001 through March 2005, Underwood, in addition to his full-time employment with High Road, worked part-time at the bus barn for the Branson School District primarily as a mechanic,

---

1. Throughout the record, High Road is also referred to as "White River Ready Mix," "Superior Ready Mix," "Ready Mix," and "Superior and Ready Mix Concrete." As far as we can discern from the record, these are all one and the same company and when used, refer to employer High Road.

and occasionally as a bus driver. Underwood worked at High Road through December 2005.

On November 28, 2005, while standing on a ladder to install a radiator in a truck at High Road, the ladder broke and Underwood fell to a concrete surface landing on his right side and right hip. He experienced immediate pain in his lower back, right hip, and right leg.

On March 7, 2006, Dr. Paul Olive ("Dr. Olive") first examined Underwood and noted that Underwood had fallen off a ladder on November 28, 2005, while working for High Road, and developed a sudden onset of severe pain. Dr. Olive diagnosed "right S1 radiculopathy causing severe pain" and initiated conservative treatment, including one epidural steroid injection.[2] However, Dr. Olive eventually determined surgery was appropriate and on April 24, 2006, performed a right L4–L5 laminotomy, L5 nerve root decompression, right L5–S1 laminotomy and discectomy, and right S1 nerve root decompression. Dr. Olive's treatment was authorized by High Road.

Dr. Olive initially released Underwood from treatment in September 2006. Underwood testified that at the time of his initial release, he continued to have significant complaints involving his low back and right leg. Underwood testified he sought treatment on his own with Dr. Diane Cornelison but she did not actually provide any treatment for his injury. He also attempted to return to work at Big O Tires in the spring of 2007, but was unable to work longer than two weeks because of his ongoing low back and right lower extremity complaints.

Underwood returned to Dr. Olive on August 23, 2007, and Dr. Olive noted:

[Underwood] states that his radicular pain is worse down his right lower extremity and into his ankle. His parathesias are worse. He is having more back pain.... He feels that his symptoms have progressed and are now much worse than when he was last seen by me. He would like to have something done in an attempt to lead a more normal life.

Dr. Olive diagnosed "radicular pain secondary to epidural fibrosis from his previous surgery" and indicated Underwood was a candidate for a spinal cord stimulator. On February 25, 2008, Dr. Olive performed surgery on Underwood to implant a "permanent Medtronic spinal cord stimulator[.]"

On July 8, 2008, Dr. Olive again released Underwood from treatment. At that time, Dr. Olive indicated that Underwood was at maximum medical improvement and indicated he did "not think that [Underwood] can work."

Underwood testified that approximately 40 percent of the pain in his lower back and right lower extremity went away after implantation of the spinal cord stimulator. However, Underwood described significant ongoing complaints involving his low back and right leg, a constant pain across his lower back, slightly below the belt line; throbbing pain in his right hip extending along the outside of his right hip and right calf and down into his foot; and continuing numbness in the outer three toes of his right foot. He also described the pain as nagging and constant, and described difficulty sleeping because of his pain. He also testified he could sit for approximately 30 minutes and then would have to move around in order to get comfortable. He could stand for no more than 30 minutes and then would have to take a break and

---

**2.** When referring to the cervical, thoracic, lumbar, and sacral sections of the spine in this opinion, the medical abbreviations used are "C," "T," "L," and "S," respectively.

sit down. He explained he could walk for about a block and then would need to sit down and stretch his leg to relieve the pain.

Underwood takes hydrocodone and Tramadol every four to six hours for pain. His medication is currently prescribed by a physician at the Veterans Health Administration. Underwood testified that his current medication interferes with his "mental clarity." He stated the medications started to give him problems approximately six to eight months prior to the hearing. Underwood, however, admitted that at the time of his deposition—18 months prior to the hearing—he had no such complaints.

Because of his low back and right lower extremity pain, Underwood can no longer engage in hobbies he previously enjoyed, including fishing, hunting, softball, and attending stockcar races. He also testified it is painful for him to ride his lawn mower and, thus, cannot mow grass anymore.

Underwood testified he drove no more than ten miles at a time. He explained that a representative of Medtronic, the supplier of his spinal cord stimulator, informed him he should not drive while the stimulator was active. If he did so, it would be dangerous because the stimulator could send false signals to his right lower extremity. Underwood explained that if he turned the stimulator off, his pain was nearly unbearable. Underwood testified that given the complaints he has in his lower back and right lower extremity, he could not return to any of his former jobs and did not feel he could currently work anywhere eight hours per day, five days a week.

Dr. Olive assessed disability for Underwood at 13 percent to the body as a whole for the injury of November 28, 2005. Dr. Olive also testified he assessed final restrictions based on the December 2008 Functional Capacity Evaluation ("FCE") conducted by Nancy Dickey ("Ms. Dickey"), an occupational therapist at Work Evaluations and Ergonomic Assessments, as follows:

> Reaching was not restricted, squatting was occasional, bending was occasional, sitting-one hour that could be resumed following positional changes, standing-one hour, can be resumed following positional changes, walking moderate to long distances, stair climbing-very occasional, balance-protective heights, crawling-very occasional, leg lift–30 pounds, carrying–50 pounds, lifting his shoulder–30 pounds, overhead lifting–20 pounds, work level was light/medium.

These restrictions were identical to those assessed in Ms. Dickey's FCE report. Dr. Olive agreed, to a reasonable degree of medical certainty, that although Underwood could not return to work as a diesel mechanic, Underwood could return to the open labor market in some capacity with the noted restrictions.

Dr. Olive was also questioned regarding the issuance of a handicap parking permit to Underwood. He indicated he may not have had direct contact with Underwood at that time, and that the issuance of the permit did not change his opinion regarding Underwood's capacity to work. On cross-examination of Dr. Olive, the following colloquy occurred:

Q. [Attorney for High Road] Doctor, I'm going to hand you what's been marked as Deposition Exhibit 7, and this appears to be the Physician Statement for Disabled License Plate or Placard that you signed on October 1, 2009. And I'll let you look at this in a minute, but you've checked the box that says "The person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neu-

rological, orthopedic condition or other severe or disabling condition" and you've indicated that's a permanent disability. You would not have done that had you felt it appropriate [sic]; true?

A. Correct.

Q. And these restrictions that you've checked on here you attribute solely to the accident and resulting injury of November 28, 2005?

A. Yes.

. . . .

Q. Again, you would not have filled out the disability form for him had you not felt it appropriate; true?

A. Correct.

Dr. Olive also agreed that he would defer to a vocational expert to determine Underwood's employability in the open labor market factoring in his work history, transferable skills, and educational background. He explained he found no evidence of symptom magnification during the two years he treated Underwood and found Underwood's complaints to be consistent with the nature of his injury. Dr. Olive explained Underwood's diagnosis of "failed back syndrome" meant "the patient did not improve with surgery and it doesn't appear that there's another solution from a surgical standpoint for him." Dr. Olive opined that Underwood's back pain and radicular complaints were permanent at that point.

Dr. Allen Parmet ("Dr. Parmet"), a physician who is board certified in occupational and aerospace medicine, testified by deposition. At the request of Underwood's attorney, Dr. Parmet conducted an independent medical evaluation of Underwood on January 15, 2009. Dr. Parmet explained that in his experience in treating some 200 individuals with spinal cord stimulators and tracking their progress, it is extremely rare to see anybody return to work because "basically nobody seems to get better. It improves them almost always, but not enough that they can do anything." He further explained that patients may have some relief, but it is not a correction of the problem and "[p]eople don't go to have stimulators unless they have severe, unremitting, intractable pain that doesn't seem to respond to narcotics very well."

Dr. Parmet also discussed the effect of Underwood's chronic pain on his concentration: "[T]he pain itself, which is constant with him, has a potential to disrupt concentration and learning and that's just a problem if you're going to be doing anything academically." Dr. Parmet also noted spasms in Underwood's lumbar spine, which he described as an "involuntary continuous muscle contraction"; identified a significant loss of range of motion; and a positive straight-leg raise and Lasegue test, indicating continuing entrapment of the sciatic nerve on the right.

Dr. Parmet opined that the accident of November 28, 2005, was the prevailing factor in causing a "herniated nucleus pulposis at L5–S1 causing L5 and S1 radiculopathy on the right" and was the prevailing factor in causing impairment of 40 percent to the body as a whole. He acknowledged the difference between "impairment" and "disability" with "impairment" being an "assessment of physical or mental loss, which is the same person to person[,]" and "disability" as using the impact of that impairment on an individual's ability to work. He testified that "given the background that Mr. Underwood had, I was skeptical that the impact of his impairment was going to lead to anything other than total disability." Dr. Parmet concluded that Underwood was limited to the sedentary level of labor. However, after reviewing Ms. Dickey's December 2008 FCE

report, he opined that Underwood was limited to the light level of labor, but did not feel he could sustain that on a continuing basis. Dr. Parmet explained he

> question[ed] whether [Underwood] could sustain the light level of labor even though he meets the physical standard for the short term.

> Mr. Eldred's evaluation suggested that [Underwood] was not going to be able to find any employment vocationally at the lighter sedentary level of labor and that leaves him permanently and totally disabled.

Dr. Parmet agreed Underwood's total disability resulted solely because of the injury of November 28, 2005. Dr. Parmet opined that Underwood would need to use ongoing medication and that such use would need to be monitored by a physician.

High Road's vocational expert, Terry Cordray ("Mr. Cordray"), testified by deposition. Mr. Cordray testified he administered the Wade Range Achievement Test III (WRAT–3) to Underwood and Underwood's test scores were consistent with his limited educational background. Additionally, Mr. Cordray administered the Wonderlic, an abbreviated IQ test. Underwood's score was an 81, indicating below-average intelligence. Mr. Cordray concluded that Underwood was capable of performing light jobs within the FCE or even sedentary jobs within Dr. Parmet's restrictions. Mr. Cordray noted he observed Underwood was required to alternate between sitting and standing in approximately 30–minute intervals throughout the testing and interview. He agreed that if Underwood was required to alternate sitting and standing at 30–minute intervals, he would be limited to jobs that allowed him the opportunity to sit and stand. He agreed that such a requirement had a negative impact on employability. Mr. Cordray also

agreed that a tenth grade education negatively impacted employability, and that Underwood's Wonderlic score of 81 indicated Underwood was unlikely to benefit from any "formalized training setting" or "book learning training." Mr. Cordray agreed having a restriction of walking no more than 50 feet would create limitations impacting employability. Mr. Cordray admitted he had not reviewed the deposition of Dr. Olive, nor was he aware of a restriction on walking more than 50 feet.

Underwood's vocational expert, Phillip Eldred ("Mr. Eldred"), testified live at the hearing. Mr. Eldred testified he reviewed medical records, deposition testimony, administered a variety of tests, and conducted an Occupational Access System (OASYS) search, to arrive at his opinions in this matter. Mr. Eldred stated he administered the WRAT–3 to Underwood as well and found Underwood's test scores to also be consistent with his limited educational background.

Mr. Eldred explained that it was very important to review deposition testimony from treating and examining physicians because they often elaborated on restrictions that had been assessed at the time of their deposition. In this case, he considered the restrictions discussed by Dr. Parmet and Dr. Olive in their respective deposition testimony to be their final restrictions. Mr. Eldred explained that when reviewing the restrictions assessed by treating and examining physicians, it was essential to look at individual restrictions assessed by those doctors rather than their characterizations of those restrictions as, for example, light, medium, heavy or sedentary exertional levels. He also considered the results of the two FCEs performed by Ms. Dickey in August 2006 and December 2008. Mr. Eldred explained that it was clear that Dr. Olive

had essentially adopted the restrictions Ms. Dickey found following her December 2008 FCE.

Of significance, Mr. Eldred noted that Ms. Dickey and Dr. Olive had concluded that Underwood was required to alternate sitting and standing every hour. He explained this restriction alone placed Underwood in the less than sedentary work capacity which, in and of itself, rendered Underwood unemployable in the open labor market. Mr. Eldred opined that given that restriction alone, Underwood would be unable to return to any of his past employment, would be unemployable in the open labor market, and would be permanently and totally disabled. He testified that Underwood's permanent total disability arose solely as a result of the injury of November 28, 2005, and solely as a result of the restrictions assessed by Dr. Olive and Ms. Dickey.

Next, Mr. Eldred addressed Dr. Olive's restriction that Underwood could walk no more than 50 feet at a time. He testified he found nothing in Dr. Olive's deposition testimony which indicated Dr. Olive did not consider that to be an appropriate restriction. Mr. Eldred explained that such restriction, in isolation, would limit Underwood to the sedentary exertional level. Mr. Eldred also examined Ms. Dickey's restriction that Underwood was limited with respect to frequent lifting of certain amounts. He explained that such a restriction would place Underwood at the sedentary exertional level. Mr. Eldred concluded that assuming Underwood could perform sedentary work (which he did not find appropriate based on the restriction that Underwood must alternate sitting and standing), he would still be precluded from performing his past work, could not find work in the open labor market, and would be permanently and totally disabled.

## Commission's Award

The Commission affirmed the Administrative Law Judge's ("ALJ") Award and decision, and incorporated the findings into the Commission's Award.

The ALJ awarded Underwood $78,465.99 for accrued permanent total disability benefits, $554.81 per week for future permanent total disability benefits, and future medical treatment as necessary to cure and relieve the effects of the work injury. Additionally, the ALJ found that "there is absolutely no doubt" that Underwood "is a credible individual and is not malingering." The ALJ relied on Mr. Eldred's explanation that Underwood's restriction of altering sitting and standing placed Underwood in the less than sedentary exertional level, and that such restriction, in isolation, rendered Underwood unemployable and permanently disabled. The ALJ also acknowledged that Mr. Eldred "analyzed individual restrictions assessed by physicians or Ms. Dickey's FCEs," but Mr. Cordray "simply used the doctors' characterization of restrictions as light or sedentary in arriving at his conclusions" and did not address the restriction that Underwood alternate sitting and standing. The ALJ also found Underwood unemployable in the open labor market even when setting aside Underwood's need to alternate positions, noting Mr. Eldred stated that Underwood is still unemployable in the open labor market based on the restrictions related to frequent lifting and walking no more than 50 feet. The ALJ additionally considered Underwood's narrow work history, inability to return to his previous occupation, his lack of transferable job skills, below-average intelligence, and concentration problems arising from the injuries and medications he was taking. This appeal followed.

High Road's sole point relied on contends the Commission erred in finding Un-

derwood was permanently and totally disabled in that the Award is not supported by competent and substantial evidence because: (1) Dr. Olive's restrictions indicated Underwood was able to return to the labor market; and (2) the Commission disregarded and misinterpreted the clear testimony of Dr. Olive in regard to the finding that Underwood could not walk more than 50 feet. Thus, the primary issue pertinent to our resolution of this matter is whether the Commission's determination that Underwood was permanently and totally disabled was supported by competent and substantial evidence.

## Standard of Review

 Pursuant to section 287.495.1,[3] this Court

shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award; [and]

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1; *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003). This Court "must determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." *Fitzwater v. Dept. of Public Safety*, 198 S.W.3d 623, 627 (Mo.App. W.D. 2006). This Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony. *Sell v. Ozarks Med. Ctr.*, 333 S.W.3d 498, 506 (Mo.App. S.D.2011). The Commission is free to believe or disbelieve any evidence. *Molder v. Missouri State Treasurer*, 342 S.W.3d 406, 409 (Mo. App. W.D.2011).

 We review questions of law *de novo*; however, "whether a particular employee is permanently and totally disabled is a factual, not a legal, question." *Molder*, 342 S.W.3d at 409. "'We will not substitute our judgment on issues of fact where the Commission was within its powers, even if we would arrive at a different initial conclusion.'" *Id.* (quoting *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 210 (Mo. App. E.D.1999)).

## Analysis

 Pursuant to section 287.020.6, the term "total disability" means the "inability to return to any employment and not merely inability to return to the employment in which the employee was engaged at the time of the accident."

The test for permanent total disability is whether the worker is able to compete in the open labor market. The critical question is whether, in the ordinary course of business, any employer reasonably would be expected to hire the injured worker, given his present physical condition.

*Molder*, 342 S.W.3d at 411 (citations and internal quotation marks omitted). "Total disability" does not require the employee be completely inactive or inert, rather, it means the inability to return to any reasonable or normal employment. *Lewis v. Kansas Univ. Med. Ctr.*, 356 S.W.3d 796, 800 (Mo.App. W.D.2011). Underwood has

**3.** All references to statutes are to RSMo Cum. Supp.2005, unless otherwise indicated. All rule references are to Missouri Court Rules (2012).

the burden to establish permanent total disability. *Id.*

High Road focuses on the fact that the "2008 [FCE] revealed significant capabilities of [Underwood], which would allow him to return to the labor market." However, High Road fails to recognize that the critical test for determining permanent total disability does not require the employee be completely inactive or inert; rather it requires an examination into whether any employer would reasonably be expected to hire the injured worker in the worker's present physical condition. *Lewis,* 356 S.W.3d at 800. Here, there was competent and substantial evidence supporting the Commission's determination that Underwood was unable to compete in the open labor market based on his physical restrictions, his limited transferable job skills, his below-average intelligence, and his concentration problems, and that no employer would reasonably be expected to hire him.

■ In support, the Commission cited Mr. Eldred's testimony that the restrictions assessed by Ms. Dickey and Dr. Olive that Underwood must alternate sitting and standing, placed Underwood in the "less than sedentary work capacity." Mr. Eldred further explained that "anybody that can't do sedentary work is unemployable." Dr. Olive testified that Underwood's restrictions relate solely to the injury of November 28, 2005. High Road argues that "Mr. Eldred transformed the restrictions from Dr. Olive and the [FCE] of one hour of standing or sitting, with slight position modification, to standing or sitting no more than 30 minutes at a time." High Road, however, fails to direct this Court to anything in the record in support of this claim.[4] Mr. Eldred specifically acknowledged the restrictions of Ms. Dickey and Dr. Olive of "sitting for *one hour,* which can be resumed following positional changes; and standing for *one hour* which can be resumed following positional changes," placed Underwood at less than sedentary work capacity.[5] (Emphasis added). Rather, it was Mr. Cordray who testified he observed the fact that Underwood was required to alternate between sitting and standing at approximately 30–minute intervals during the testing and interview.[6]

■ Furthermore, the Commission found Mr. Eldred to be more persuasive

4. The argument section of High Road's brief asserts numerous facts without any indication of where reviewing authority may look to ascertain their accuracy. Rule 84.04(i) requires: "All statements of fact and argument shall have specific page references to the legal file or the transcript." Compliance with the portion of the appellate briefing rule governing references to the record "is mandatory and essential for the effective functioning of appellate courts, which cannot spend time searching the record to determine if factual assertions are supported by the record[ ]"; reviewing authority may not become an advocate for the non-complying party on appeal. *State v. Hardin,* 229 S.W.3d 211, 215 (Mo. App. W.D.2007) (internal quotation and citation omitted). Nevertheless, High Road's lack of conformity to Rule 84.04 is not sufficient to warrant the harsh remedy of dismissal. *See Kantel Communications, Inc. v. Casey,*

865 S.W.2d 685, 692 n. 2 (Mo.App. W.D. 1993).

5. Additionally, Dr. Parmet opined that Underwood was limited to the light exertional level but did not feel that he could sustain that on a continuing basis; he "question[ed] whether [Underwood] could sustain the light level of labor even though he meets the physical standard for the short term[ ]" and that "Mr. Eldred's evaluation suggested that [Underwood] was not going to be able to find any employment vocationally at the lighter sedentary level of labor and that leaves him permanently and totally disabled."

6. However, Underwood himself testified that he could sit for approximately 30 minutes and then would have to move around in order to get comfortable again, and could stand for no more than 30 minutes.

and credible than Mr. Cordray. The Commission specifically noted that Mr. Eldred analyzed individual restrictions assessed by physicians or Ms. Dickey's FCE, whereas Mr. Cordray simply used the doctors' characterization of restrictions as light or sedentary in arriving at his conclusions—noting also Mr. Cordray did not address the restriction that Underwood alternate sitting and standing. When conflicting expert opinions are offered, the Commission must reconcile the evidence and make a determination of fact. *Elmore v. Missouri State Treasurer as Custodian of the Second Injury Fund*, 345 S.W.3d 361, 370 (Mo.App. S.D.2011).

High Road also argues the "primary basis" of the Commission's decision was Underwood's restriction for walking no more than 50 feet and that there is no credible evidence supporting the proposition that Underwood is unable to walk more than 50 feet. First, High Road is misguided in claiming the "primary basis" of the Commission's decision was that Underwood could not walk more than 50 feet without resting. Rather, the Commission explained this was an additional reason supporting Underwood was unemployable in the open market. The Commission found:

> But even setting aside the need to alternate positions, Mr. Eldred credibly explained that if [Underwood] could walk no more than 50 feet without resting, and Ms. Dickey's restriction related to frequent lifting, were sufficient to place [Underwood] in the sedentary exertional level. Mr. Eldred said even at that level, [Underwood] still is unemployable on the open labor market given all of the factors in this case. [We] agree.

Nevertheless, we note there was evidence of this walking restriction. The Physician Statement for Disabled License Plate or Placard signed by Dr. Olive on October 1, 2009, showed Dr. Olive checked the box that said, "The person cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition or other severe or disabling condition[,]" and indicated it was a permanent disability. Dr. Olive testified that he would not have signed the statement unless he felt it was appropriate. Additionally, Underwood testified he could walk for about a block and then would need to sit down and stretch his leg to relieve the pain.

High Road additionally contends there was no competent and substantial evidence that Underwood had issues with focus and attention. However, Dr. Parmet testified that Underwood's chronic pain could disrupt his concentration. Also, Underwood himself testified to his concentration problems resulting from the pain medication he takes.

Importantly, the Commission found Underwood to be "particularly credible." The Commission believed, based on the whole record, that Underwood's physical limitations were more severe than those reported in the FCE. While the Commission found both examining physicians to be credible, it found Dr. Parmet more persuasive as to the extent of Underwood's disability noting Dr. Olive "appears to have simply adopted the report of Nancy Dickey as to physical restrictions and limitations." Again, this Court defers to the Commission on credibility issues. *Sell*, 333 S.W.3d at 506. In our review of the whole record, we find extensive competent and substantial evidence supporting Underwood has few transferable skills, has below-average intelligence and would have difficulty retraining due to concentration problems, and has significant physical restrictions that make him unable to compete in the open labor market. As such,

the Commission's determination that Underwood was permanently and totally disabled was supported by competent and substantial evidence. Point denied. The Award is affirmed.

ROBERT S. BARNEY, and JEFFREY W. BATES, JJ., concur.