Jackie PORTER, Employee–Appellant,

v.

RPCS, INC., Employer–Respondent.

No. SD 32492.

Missouri Court of Appeals, Southern District, Division One.

June 26, 2013.

Randy Alberhasky, Springfield, MO, for Appellant.

Raymond E. Whiteaker and Brandon C. Potter, Springfield, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

Jackie Porter ("Porter") appeals a unanimous decision by the Labor and Industrial Relations Commission ("Commission") denying Porter's claim for workers' compensation benefits. We affirm the decision of the Commission.

**Factual and Procedural Background**

On June 11, 2001, Porter began working for RPCS, Inc. ("RPCS")[1], at the corporate office. Her job consisted of sorting coupons while sitting at a desk.

On July 16, 2009, at approximately 4:00 p.m., Porter fell in the bathroom at RPCS. Porter broke her hip as a result of the fall and received emergency medical treatment, followed by rehabilitation. Porter was approximately 83 years of age at the time of her accident.

On December 21, 2009, Porter filed a "Claim for Compensation" alleging she had fallen on a "slippery floor in restroom." Porter sought additional medical treatment and temporary total disability compensation. Porter also alleged she was entitled to "multiple increases in the award pursuant to RSMo. Sec. 287.120[[2]] [sic] as a result of the employer's failure to obide [sic] by safety laws and regulations and failure to reasonably develop and enforce safety procedures/devices for dangerous conditions known or discoverable to the employer." On January 8, 2010, RPCS filed its "Answer" denying Porter's claim.

On July 28, 2011, a hearing was held before the Administrative Law Judge ("ALJ") at the Division of Workers' Com-

---

1. RPCS, Inc., owns and operates the Ramey's, Price Cutter, and Smitty's supermarkets. RPCS is sometimes referred to as "Ramsey's" in the record.

2. All references to statutes are to RSMo Cum. Supp. (2005), unless otherwise indicated.

pensation ("Division"). Porter testified she had no memory of falling or what caused her to fall. She recalled washing her hands and then waking up on the floor. She did not recall how she got on the floor, "unless the floor was wet." Porter testified she did not remember looking at the bathroom floor prior to her fall. Porter testified that before her fall, she did not use a walker but used one now.

Porter could not recall having been previously diagnosed with conclave scoliosis, spondylosis, osteoporosis, osteopenia, severe and extensive degenerative disc disease, cardiac dysrhythmia, or atrial fibrillation, and did not recall that it was feasible her fall was the result of "uncontrolled atrial fibrillation." She did recall having been diagnosed with arthritis, "[m]ostly in my legs."

No one witnessed Porter's fall, or witnessed water or any other debris or material on the floor that could have caused Porter's fall.

Thomas James ("James"), Porter's grandson, testified on her behalf at the hearing. At the time of his testimony, Porter was 85 years old and in poor health. James had lived off and on with Porter for much of the past 10 years, but consistently since January 2009. He testified that Porter was mentally "sharp as a tack" and physically spry before the accident, she walked a lot, but had always had a bend in her back and poor posture. James testified Porter's memory is "better some days than others[,]" she jumbled or got wrong "daily routine stuff."

James often drove Porter to and from work, taking her at about 8 a.m. and picking her up at around 4:30 p.m.[3] On the date of the accident, James dropped Porter off at work in the morning and was scheduled to pick her up at the end of the day. When he arrived to pick her up that afternoon, he was met by an RPCS employee who told him Porter had fallen. He found Porter slumped on the floor between "an outside door and like a foyer area and to the door that went into the bathroom."[4] Porter was conscious and lucid, but in pain. Porter told James she "went to the restroom and she woke up on the floor."

James called for an ambulance and as he was holding Porter's hand, he wedged his foot against the outside door, from the hallway into the foyer, to keep it open. He noticed the floor was slick, "like a waxed floor[,]" and he had trouble keeping the door open with his foot. The door was larger and heavier than a typical household door and had a device on the top that put pressure on the door so that it would automatically close. The floor was a hard smooth laminate-type surface in the foyer with tile flooring in the bathroom. James never entered the women's bathroom at RPCS, although he did see about five feet inside the bathroom when the door opened. He did not see any water, oily substance, or debris on the floor when the bathroom door opened.

James testified that Porter did not appear to be wet. He also testified that Porter told him she did not recall how she fell, but was in the bathroom when it happened. James accompanied Porter to the hospital and managed her medical care thereafter.[5]

James never knew Porter to be unsteady when she walked or to need a cane

---

3. Porter worked eight hours a day, five days a week.

4. The "foyer area" is also described as an "entryway" or "vestibule" in the record.

5. After hip surgery, Porter underwent treatment and therapy for approximately two months at a rehabilitation facility.

or walker prior to the incident at RPCS, and stated Porter had no history of passing out or losing consciousness prior to her fall. He recalled in recent years Porter had fallen only twice before the accident; once in the ice-covered parking lot when going to work at RPCS, and another time at home when she tripped over a dog bed in the dark and broke her wrist. James testified Porter wore glasses before the accident, but had gone through cataract surgery a month or two before the accident and had been given a new prescription since her eyesight had improved. Porter had not expressed to him any problems with her glasses or vision.

Angie Bolen ("Bolen") testified by deposition on behalf of RPCS, where she worked as the assistant controller and supervisor to Porter. Bolen had already left for the day at the time of Porter's accident, so she had no first-hand knowledge of any of the events which took place surrounding the accident. However, she was familiar with the bathroom where Porter fell and stated the bathroom floor where Porter fell was made up of one-inch-square tile, an older bathroom tile, and there were no "hazards in this bathroom that might cause someone to trip or fall[.]" As to the "little foyer area" leading into the bathroom, she testified that it was a "smooth transition from the bathroom into the foyer"—no "lip or any sort of bump that someone might trip over[.]" She agreed the two entry doors to the bathroom were made of wood and larger than those you would find in a home, with each having a mechanical arm on the top to close them automatically. Bolen testified that the facility was cleaned by an outside company that came in only at night, and that no one cleaned the bathrooms during the day. However, she recalled seeing a mop bucket and other cleaning supplies in the foyer on occasion if the cleaning crew failed to store them away in the janitorial closet.

Bolen testified that after Porter was involved in an auto accident in 2008, she had a lot of back pain and was "hunched over" more than usual. She testified Porter had always walked a little hunched over, but after the auto accident, she was hunched over to the point that even standing, "she was looking at the floor[.]" Bolen testified that Porter would look down as she walked and had to "arch her neck to look up[.]" Bolen described Porter as "more spry" prior to the auto accident.

Bolen further testified that Porter had more balance issues after the auto accident and that sometimes it would be better and sometimes worse that it "just depend[ed] on the earliness of the day, if she's felt more rested[.]" However, Porter's condition was not so unsteady that Bolen considered it to be unsafe. Bolen stated Porter also had problems with her eyesight, particularly after her cataract surgery. After Porter's surgery, she would misstep or bump into something and would comment, " 'Oh, I'm just having a hard time getting used to these glasses.' " Bolen testified that Porter might have a misstep, but she never saw Porter fall. She testified Porter would often lean against a desk when she stood.

Bolen stated Porter was just not the same after her auto accident, however, she was still working full time and doing her job adequately when the July 2009 fall occurred. Bolen was not worried Porter would fall at work, and that besides Porter having "some balance issues, [she] wasn't expecting her to fall down. She'd never fallen." She testified that as a manager for RPCS, had she thought Porter was unsteady to the point of being unsafe, she would not have allowed her to continue to work.

Debbie Blodgett ("Blodgett"), accounting clerk for RPCS, also testified by deposition. Blodgett was working on the day Porter fell. Around 4:10 p.m., she heard Porter cry for help and found her slumped against the wall in the interior foyer just outside the bathroom. Porter was coherent, but in pain. Blodgett asked Porter what had happened and Porter said she had fallen. Porter told her she was in the "bathroom area, had reached out for the stall door, and lost her balance and fell." When asked how she got into the foyer outside the bathroom, Porter told her she "pushed herself through the door and then hollered for help."

Blodgett did not observe Porter's clothes as being wet, sticky or oily, nor did she notice any water, sticky substance, or oil substance on the floor. Blodgett did not see anything blocking the bathroom stalls, or anything that would cause someone to trip or fall. She testified that the bathroom floor just "look[ed] like ordinary tile" with no holes that would cause someone to trip and fall.

Blodgett stated Porter never walked in a straight line, and after being shown a surveillance video, indicated that the "zig-zagging from right to left" was Porter's normal walk. Blodgett also testified that after Porter's auto accident, she saw changes in Porter's posture, balance and walking, and Porter was always complaining of back pain.

Heather Bonner ("Bonner"), payroll assistant for RPCS, testified by deposition. She testified that she followed Blodgett to the bathroom when they heard someone crying out for help and heard Porter tell Blodgett that she had "lost her balance and fallen." Porter's clothing did not look wet, oily or sticky. Porter told her that

she had fallen inside the bathroom and had yelled for help, but no one heard her so she crawled through the first door into the foyer.

Bonner testified consistent with Bolen and Blodgett regarding Porter's problems with balance and walking prior to her fall. Bonner confirmed that Porter walked in a hunched position and would often "trail" her hand behind her against the wall for guidance.

Dr. Shane Bennoch ("Dr. Bennoch") testified by deposition. Dr. Bennoch diagnosed Porter as having a displaced right femoral neck fracture with surgery on the right hip and persistent back pain secondary to traumatic fractures at T11 and T12.

Dr. Bennoch testified that Porter told him, in describing her fall, that one moment she was standing up and the next moment she woke up on the floor. Porter was unaware of how she got to the floor. Dr. Bennoch stated there were two possibilities as to how Porter fell—she had a syncopal episode and fell, or she just fell as a result of "some type of slip." Dr. Bennoch stated it was possible Porter had a vasovagal syncope episode, triggered by a sudden drop in blood pressure, which would cause a person to lose consciousness transiently and then awaken. However, in his opinion, a syncopal episode was highly unlikely "based on her pre- and post-history" and it was "much more likely that this was a slip and fall." Dr. Bennoch went on to explain that Porter had never had "a syncopal episode before, she never had a syncopal episode after, and so it would be very unlikely that just out of the blue she had one for no reason." He also testified it was unlikely that an uncontrolled atrial fibrillation caused a syncopal episode or dizziness.[6]

---

6. Dr. Bennoch testified before he could say whether Porter's fall was due to an "atrial

fibrillation," he would need to see any EKG that was taken at the hospital on the day of

Dr. Bennoch stated he had seen the video of Porter walking in and out of her apartment and balance was not an issue for her, "because she walked actually quite rapidly, even though she was kyphotic." [7] He did state that if you have someone "with kyphosis where they're tilted forward, they may be more likely to fall, but watching the way [Porter] walked," he did not "think it was an impediment for her." Dr. Bennoch further testified slick surfaces are much more likely to cause a fall and there is a higher risk of falling in a bathroom where there is a tile surface, as opposed to in someone's living room where there is carpeting.

Dr. Bennoch attributed Porter's lack of memory of the fall to the type of injury which at times causes people to have a lack of memory after the fall. In Porter's case, she may have hit her head and simply did not remember. It was Dr. Bennoch's opinion that Porter lost consciousness transiently, which occurs frequently with falls.

Dr. Jeffrey Woodward ("Dr. Woodward"), examined Porter and testified that within a reasonable degree of medical certainty, work was not the prevailing factor in causing Porter's injuries on July 16, 2009. Dr. Woodward's opinion was based on his review of the medical records, as well as review of his direct history taken from Porter, neither of which indicated Porter had slipped or tripped on any object or substance. He noted Porter was unable to indicate any reason or cause for her to fall in the bathroom at work that day. The history indicated Porter went into the bathroom in the workplace and then woke up on the floor. He stated Porter clearly did not remember whether the floor was wet or whether she had tripped or slipped on any object. Also, Porter did not report any specific problems in the bathroom, such as a wet floor or some other uneven surface or construction.

Dr. Woodward's opinion was further based on his review of Porter's medical records and the videotape, in which Porter's standing and walking posture was noted to be extremely abnormal with a severe thoracic spine kyphosis and forward-bent posture, further supporting his opinion that there was no prevailing work-injury causation. Dr. Woodward also testified Porter's scoliosis and kyphosis, along with Porter's severe spine abnormalities, would increase her risk for losing her balance and falling.

Dr. Woodward testified that while he agreed Porter's fall was the prevailing cause of her injury to the right hip and thoracic spine, it was his medical opinion that Porter's fall was "most likely not a work-related injury and was not directly caused by any specific work duty activity [Porter] was required to perform for that job," and that it was his opinion the fall occurred while Porter was

> performing daily, routine restroom activities and she positionally just happened to be at work, but that this event could have occurred anywhere else just as likely, and that based on the history by

---

Porter's fall. However, he stated an EKG would only tell him Porter had atrial fibrillation and an arrhythmia, but not a syncopal episode. He stated syncopal episodes can occur with atrial fibrillation, but it was very unusual. Dr. Bennoch testified he did not ever remember a patient "presenting to me, and I've seen a lot of atrial fibrillation, and the initial presentation was syncope[.]"

7. "Kyphosis" is a forward rounding of the upper back (curvature of the spine) which may cause the ribcage to press against the lungs inhibiting the ability to breathe. It usually occurs because of vertebrae collapsing over time. It can be genetic.

the patient and other medical providers there was no other compelling cause in the workplace that would make that event work-related.

It was his opinion that the most likely cause was a "loss of balance due to her postural challenges from her spine deformity and her elderly state and that [Porter] just happened to fall at that time."

It was Dr. Woodward's opinion, based on Porter's history, review of the records, and medical examination, that the "most likely prevailing cause" was Porter's "poor balance and postural abnormalities without necessarily any dizziness or lightheaded condition."

A hearing was held on July 28, 2011. On September 14, 2011, the ALJ issued her "Award" denying Porter's claim because Porter had failed in her burden of proof to establish why she fell, there were no witnesses, and Porter was an unreliable historian. The ALJ found all of the fact witnesses testified credibly, and did not find Porter's testimony reliable because she could not recall any details as to how or even if she fell. The ALJ further noted no one saw water or any other debris or material on the floor that would have caused Porter to fall, and there is no evidence Porter fell because of the "heavy" bathroom doors. The ALJ determined there was simply no evidence in the record

demonstrating a nexus between [Porter]'s work and the cause of her purported fall. If she simply lost her balance, as suggested by Dr. Woodward, [Porter] could have fallen anyplace in her nonemployment life.... [Porter's] workplace merely provided the location for an injury, and was not the cause of the injury.

The ALJ also found the testimony of Dr. Woodward more persuasive than that of Dr. Bennoch because although Dr. Bennoch's testimony suggested a causal connection for Porter's fall, Dr. Bennoch admitted he did not know.

Ultimately, the ALJ found Porter failed to prove that she sustained an accident that arose out of her employment and denied compensation.

Subsequently, Porter filed her "Application for Review" with the Commission. On December 7, 2012, the Commission affirmed the ALJ's Award and issued its "Final Award Denying Compensation (Affirming Award and Decision of Administrative Law Judge by Supplemental Opinion)" ("Final Award"). The Commission agreed with the ALJ's finding that Porter did not provide "credible testimony regarding the circumstances of her fall owing to memory and cognition problems." The Commission found that Porter's hearing testimony that the last thing she remembered "was washing her hands[ ]" contradicted her deposition testimony that the last thing she remembered was "locking the bathroom door[.]"

The Commission found the evidence regarding the dispute as to whether Porter fell inside or outside the bathroom was "indeterminate." The Commission found that both Blodgett and Bonner testified they heard Porter say she fell inside the bathroom and then crawled out of the bathroom, but the Commission determined this to be unlikely considering that the vestibule door was "super heavy," and the possibility that Porter was able to "navigate her way through that door while crawling on the floor with a serious hip injury." The Commission stated it was difficult to imagine how Porter could have made it through the vestibule door in such a condition, which would tend to indicate Porter fell in the vestibule, rather than inside the bathroom, and that this lack of credible evidence of the circumstances of Porter's fall did not permit the Commission to resolve this question.

As a result, in light of the foregoing ambiguities and gaps in the evidence, the Commission was only able to find the following facts with regard to what happened to Porter on July 16, 2009: "(1) [Porter] was on her feet inside the bathroom, (2) [Porter] fell for unknown reasons, and (3) employee was discovered on the floor outside the bathroom. We are unable to determine the *specific* risk or hazard that resulted in [Porter]'s fall." (Emphasis added).

The Commission concluded that Porter sustained an accident, proved she suffered an unexpected traumatic event "identifiable by time and place" during her work shift, and satisfied the statutory definition of "accident." However, the Commission found Porter "failed to establish, as a factual proposition, the risk or hazard that resulted in her fall." Although Porter advanced a number of theories why she fell; i.e., the heavy door to the bathroom, tile flooring in the bathroom, the smooth laminate flooring in the vestibule, or water or some other substance on the bathroom floor, these "disparate attempts to portray [RPCS]'s bathroom as unusually treacherous merely reinforce the conclusion that we simply don't know what risk or hazard caused [Porter] to fall."

The Commission noted, "[Porter]'s evidence does not permit us to rule out the possibility that nothing about the bathroom itself actually contributed to the event but that [Porter] 'just fell.'" The Commission concluded that

because [Porter] has failed to identify a specific risk or hazard, we are unable to perform the causal connection test identified by the court in *Johme [v. St. John's Mercy Healthcare,* 366 S.W.3d 504 (Mo. banc 2012)] as determinative of the issue whether [Porter]'s injuries arose out of and in the course of her employment.

The Commission also rejected Porter's argument that the *res ipsa loquitor* doctrine should be applied because Porter fails to "identify any authority for using a common law civil negligence doctrine to analyze a statutory element of a workers' compensation claim."

The Commission affirmed the Award of the ALJ and denied Porter's claim because she failed to "prove that she sustained injuries arising out of and in the course of employment for purposes of the Missouri Workers' Compensation Law." All other issues were rendered moot. This appeal followed.

Porter contends the Commission erroneously interpreted and applied section 287.020.3(b) by requiring Porter to prove the specific " 'hazard or risk' " that caused the accident, rather than requiring her to merely prove, based upon a preponderance of the evidence, that the accident resulted from *a* (unspecified) " 'hazard or risk' " that could come from one of a number of compensable causes, in isolation or through a combination." Porter further contends the Commission erred in refusing to apply the doctrine of *res ipsa loquitor* to her claim.

The issues for our determination are:

1. Did the Commission err in concluding Porter failed to prove that she sustained injuries arising out of and in the course of her employment for purposes of the Missouri Workers' Compensation Law because she failed to identify a specific risk or hazard that caused the accident?

2. Did the Commission err in refusing to apply the doctrine of *res ipsa loquitor?*

### Standard of Review

As set forth in article V, section 18 of the Missouri Constitution, judicial

review of the Commission's award [8] is a determination of whether the award is "supported by competent and substantial evidence upon the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003) (internal quotation marks omitted). Pursuant to section 287.495.1, RSMo 2000, this Court

> shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the [C]ommission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the [C]ommission do not support the award; [and]
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1 (footnote omitted); *see also Hampton*, 121 S.W.3d at 222. An award that is clearly "contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223. This Court "must determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." *Fitzwater v. Dept. of Public Safety*, 198 S.W.3d 623, 627 (Mo. App. W.D.2006). This Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony. *Sell v. Ozarks Med. Ctr.*, 333 S.W.3d 498, 506 (Mo.App. S.D.2011). The Commission is free to believe or disbelieve any evidence. *Molder v. Missouri State Treasurer*, 342 S.W.3d 406, 409 (Mo.App. W.D.2011). " 'We will not substitute our judgment on issues of fact where the Commission was within its

powers, even if we would arrive at a different initial conclusion.' " *Id.* (quoting *Messex v. Sachs Elec. Co.*, 989 S.W.2d 206, 210 (Mo.App. E.D.1999)). In addition, it is for the Commission to accept or reject medical evidence. *Casteel v. General Council of Assemblies of God*, 257 S.W.3d 160, 162 (Mo.App. S.D.2008). While we defer to the Commission on issues of fact, we review questions of law *de novo*. *Id.*

### Analysis

#### Point I: The Commission Did Not Err in Concluding Porter Failed to Prove She Sustained Injuries Arising Out of and in the Course of Her Employment.

■ Porter's injury is compensable in workers' compensation "only if it arose out of and in the course of her employment pursuant to section 287.020.3(2)." *Johme*, 366 S.W.3d at 509. The workers' compensation statutes expressly instruct that section 287.020.3(2) controls the determination of whether an employee's injury shall be deemed to have arisen out of and in the course of employment. *Id.* Here, there is no issue alleged regarding whether Porter's fall at RPCS was the prevailing factor in causing her injury, a required finding for compensable injury under 287.020.3(2)(a). The issue in this case is the application of section 287.020.3(2)(b), which provides:

> An injury shall be deemed to arise out of and in the course of the employment only if:
>
> . . . .
>
> It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of an unrelated to the

---

8. Findings of the ALJ adopted by the Commission and incorporated into the Commission's decision are reviewed by the appellate court as the findings of the Commission. *Sell*, 333 S.W.3d at 505.

employment in normal nonemployment life.[9]

Porter argues in Point I that:

THE COMMISSION ERRED AS A MATTER OF LAW IN DENYING THE CLAIM ON THE BASIS THAT THE EMPLOYEE FAILED TO PROVE *'THE* SPECIFIC RISK OR HAZARD' THAT CAUSED HER FALL BECAUSE R.S.MO. SEC. 287.020.3(B) [SIC] ONLY REQUIRES THAT THE ACCIDENT COME FROM *'A* HAZARD OR RISK,' WHICH THE EMPLOYEE PROVED BASED UPON A PREPONDERANCE OF THE EVIDENCE, IN THAT THE EMPLOYEE PRODUCED COMPETENT AND SUBSTANTIAL EVIDENCE THAT SHE FELL AS A RESULT OF ONE OR MORE COMPENSABLE RISKS, IN ISOLATION OR COMBINATION, SUCH AS A SLIPPERY TILE FLOOR, AND/OR A WET FLOOR AND/OR A HEAVY DOOR.

(Emphasis in original). Porter attempts to paint this issue as a question of law when it is actually a question of fact, based upon the record before us.

■■■ The Commission's finding did not require Porter to prove *"the"* hazard or risk. Rather, the Commission found because Porter failed to identify "a" specific hazard or risk, the Commission never got to the point of determining whether Porter's injury resulted from a hazard or risk to which Porter would not be equally exposed to in "normal nonemployment life" under *Johme,* 366 S.W.3d at 511. Porter must show a "causal connection" between her injury and her work activity in order for the injury to "arise out of and in the course of employment" under

287.020.3(2)(b). *Id.* In order to show a causal connection under *Johme,* an employee must identify the cause of the injury. Here, Porter fails to recognize that the basis for the Commission's factual finding was its conclusion that the risk or hazard that caused her injury was not established by Porter.

■■■ "An injury will not be deemed to arise out of employment if it merely happened to occur while working[.]" *Miller v. Missouri Highway and Transp. Comm'n,* 287 S.W.3d 671, 674 (Mo. banc 2009). Porter was in the bathroom and fell, but there is no evidence that something about her work caused her fall. *Id.* Porter failed to prove she fell due to some condition of her employment or due to an unsafe location due to her employment. *Id.* The only causal connection of the work activity to her injury is the fact that it occurred while Porter was at work. *Id.*

■■■ Porter's failure to meet her burden of proof is supported by *Bivins v. St. John's Regional Health Center,* 272 S.W.3d 446 (Mo.App. S.D.2009). Like *Bivins,* the issue here is the Commission's application of 287.020.3(2)(b) to the facts in this case. A workers' compensation claimant "bears the burden of proof to show that [the] injury was compensable in workers' compensation." *Johme,* 366 S.W.3d at 509; § 287.808. Porter's burden of proof includes establishing the injury arose out of and in the course of her employment; i.e., the accident is the prevailing factor in causing the injury; and the injury did not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed to outside of and unrelated to the employment in nor-

9. Section 287.020.3(2)(b) was revised in 2005 to narrow the scope of those injuries that would be deemed to arise out of and in the course of employment. *Miller v. Missouri Highway and Transp. Comm'n,* 287 S.W.3d 671, 672 (Mo. banc 2009).

mal nonemployment life. *Miller*, 287 S.W.3d at 673.

In *Bivins*, the Commission found the employee was walking in a hallway "when the employee 'just fell', meaning that she simply or merely fell, without explanation.... [T]he injury simply was the result of an unexplained fall." *Bivins*, 272 S.W.3d at 449. The Commission did not find credible the employee's testimony that her foot stuck to the floor prior to falling. *Id.* This Court affirmed the Commission's order denying compensation, giving deference to the Commission's finding that the injury was not work related. We noted:

> The [C]omission determined that claimant failed to show that she was exposed to an unusual risk of injury that was not shared by the general public. This determination was based on the [C]ommission's assessment of the credibility of witnesses. This [C]ourt is bound by that determination.

*Id.* at 450(citing *Clayton v. Langco Tool & Plastics, Inc.*, 221 S.W.3d 490, 493 (Mo. App. S.D.2007)).

■ Like the employee in *Bivins*, Porter failed to meet her burden. In this case, the Commission found:

> [E]mployee's evidence does not permit [the Commission] to rule out the possibility that nothing about the bathroom itself actually contributed to the event but that employee 'just fell.' In other words, because employee has failed to

identify a specific risk or hazard, we are unable to perform the causal connect test identified by the court in *Johme* as determinative of the issue whether [Porter]'s injuries arose out of and in the course of her employment.

Porter herself could not remember any details of how she fell or what caused her to fall. She simply recalled washing her hands and then waking up on the floor. No one witnessed Porter's fall, or witnessed water or any other debris or material on the floor that could have caused Porter's fall. There was no evidence that Porter's clothes were wet, oily or sticky, and no evidence of any holes or broken tiles on the floor. The two employees that found Porter after the fall testified Porter, when asked how she fell, said she "had reached out for the stall door, and lost her balance and fell."

■ Porter argues this case is distinguishable from *Bivins* because she "produced ample and persuasive evidence, through expert testimony[,] circumstantial factors and common sense, of the multiple risks [she] was exposed to at work," and "[w]hile it is *possible* [she] 'just fell' ... it is not likely." (Emphasis in original). Porter admits she presented no direct evidence why she fell.[10] "Where competent evidence or permissible inferences conflict, 'the choice rests with the Commission and is binding upon this [C]ourt.'" *Clayton*, 221 S.W.3d at 493 (quoting *Montgomery v.*

---

10. Porter argues her fall was caused by one of three factors: (1) the nature of bathroom tile and veneer flooring being slippery; (2) the "substantial" chance the tile and floor was made more slippery by water spills from sinks, toilets, mop buckets and fountains; and (3) Porter being pushed off balance by the heavy bathroom door. The flaw in this argument is each claim is either based on speculative testimony or lacks any evidentiary support. For example, James testified the floor was slick. However, he did not enter the bathroom, and only saw about five feet into the bathroom when the door opened. In addition, he did not see any water or sticky substance on the floor when he looked into the bathroom. There was no evidence the floor was wet or that Porter was wet after the fall to support Porter's claim of a "substantial" chance a spill made the floor more slippery. Additionally, no evidence was presented that the bathroom door caused Porter's fall.

*Mo. Dept. of Corrections and Human Resources,* 849 S.W.2d 267, 271 (Mo.App. E.D.1993)).

■■■ The Commission found there was a "lack of any credible evidence of the circumstances of [Porter]'s fall[.]" While Porter may have provided circumstantial evidence of what she believed to be the *"most likely* explanation," the Commission's determination is supported by the testimony presented.[11] The Commission's determination was based on its assessment of the credibility of the witnesses. This Court is bound by the Commission's credibility determination. *Bivins,* 272 S.W.3d at 450.

Under the facts of this case before this Court, we conclude the Commission did not err in concluding Porter failed to prove that she sustained injuries arising out of and in the course of her employment because she failed to identify a specific risk or hazard that caused the accident. Porter failed to establish how she fell and, therefore, failed to show that she was exposed to an unusual risk of injury that was not shared by the general public. *See Bivins.* This opinion should not be read to automatically restrict or exclude workers' compensation benefits for injuries of relatively sedentary professional employees such as Porter (her job consisted of sorting coupons while sitting at a desk) based on the risk or hazard being unrelated to employment.[12] This opinion should not be read to exclude such benefits across the board because *in this specific case* we are affirming the Commission's finding that failed to establish, as a factual proposition, how Porter fell. This failure prevented the Commission from proceeding to the next step to determine if "the hazard or risk" was related or unrelated to employment.

### Point II: The Commission Did Not err in Refusing to Apply the Doctrine of Res Ipsa Loquitor

■■■ Porter also claims error in the Commission's refusal to apply the doctrine of *res ipsa loquitor* to her claim. The doctrine of *res ipsa loquitur* is a *rule of evidence* that allows a jury to infer from circumstantial evidence that the plaintiff's injury resulted from a negligent act of the defendant, without requiring the plaintiff to allege and prove the defendant's specific negligence. *Weaks v. Rupp,* 966 S.W.2d 387, 393 (Mo.App. W.D.1998). Under this rule of evidence, a plaintiff is relieved from the burden of pleading and proving specific negligence. *Bonnot v. City of Jefferson City,* 791 S.W.2d 766, 768 (Mo.App. W.D. 1990).

■■■ Porter argues in Point II that:
THE COMMISSION ERRED IN DENYING THE CLAIM BY REFUSING TO APPLY THE DOCTRINE OF RES IPSA LOQUITOR BECAUSE PURSUANT TO R.S.MO. SEC. 287.020.3(2)(B) (2005) [SIC] THERE WAS PROOF UNDER THE DOCTRINE THAT THE EMPLOYEE FACED A HEIGHTENED. RISK OF FALLING RELATED TO HER WORK IN THAT FALLS TYPICALLY DO NOT OC-

---

11. Porter further argues that an employee has met her burden of proof if "the employee can prove that a number of different but compensable risk factors, in isolation or in combination, constitute the likely cause of the employee's accident[.]" This argument ignores the Commission's role in determining the credibility and weight given to witness testimony,

*Sell,* 333 S.W.3d at 506; freedom to believe or disbelieve any evidence, *Molder,* 342 S.W.3d at 409; and to accept or reject medical evidence, *Casteel,* 257 S.W.3d at 162.

12. This concern was raised by Chief Justice Richard B. Teitelman in his dissenting opinion in *Johme,* 366 S.W.3d at 512–13.

CUR WITHOUT A CAUSE, THE EMPLOYEE HAD NO HISTORY OF SPONTANEOUSLY FALLING WITHOUT A CAUSE, THE EMPLOYER HAD CONTROL OVER THE BATHROOM AND SUPERIOR KNOWLEDGE WITH RESPECT TO THE BATHROOM'S CONDITION.

Porter supplies no case law applying the doctrine of *res ipsa loquitor* to a worker's compensation claim, and our research locates no such case law either. We decline to extend this doctrine in that manner.

 First of all, *res ipsa loquitor* is a rule of evidence used to prove a tortfeasor's negligence in a civil trial action. An employee is not required to prove an employer's negligence in the statutory requirements of a workers' compensation claim.

Porter argues the 2005 amendments to the Workers' Compensation Law "more closely tracks the issues raised in common negligence claims[,]" as "[r]isk analysis as it relates to employment became the primary issue for determining whether an accident rises [sic] out of and in the course and scope of employment." Porter's argument fails for the same reasons cited in response to Point I. Her position ignores the fact that "[a]n injury will not be deemed to arise out of employment if it merely happened to occur while working[.]" *Miller*, 287 S.W.3d at 674.

An accident means "an unexpected traumatic event or unusual strain identifiable by time and place of occurrence and producing at the time objective symptoms of an injury caused by a specific event during a single work shift. An injury is not compensable because work was a triggering or precipitating factor." § 287.020.2. Under the 2005 statutory amendments, an injury by an accident is compensable only if it arose out of and in the course of employment. § 287.020.3(2). "The burden is upon [Porter] to prove that injury arose out of and in the course of employment." *Clayton*, 221 S.W.3d at 492 (internal quotation and citation omitted).

 If the *res ipsa loquitor* rule of evidence applied, "the event must be an unusual occurrence which ordinarily results from negligence and from which, therefore, negligence is a reasonable inference." *Christie v. Ruffin*, 824 S.W.2d 534, 536 (Mo.App. E.D.1992). This evidentiary theory relies on the *"lack of evidence* of specific negligence." *Id.* (emphasis added). On the other hand, the Workers' Compensation Law is statutory, and the statutory language required Porter to show that her injury did "not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life." § 287.020.3(2)(b). This means Porter must establish, as a factual proposition, how she fell, defeating the application of *res ipsa loquitor*.[13] Allowing the application of *res ipsa loquitor* to a workers' compensation claim conflicts with a claimant's statutorily imposed burden to prove that injury arose out of and in the course of employment.[14]

---

13. This holding should not be extended to require a claimant to prove specific negligence. Rather, we find that the doctrine of *res ipsa loquitor* has not been extended to apply to workers' compensation claims by the legislature or the Supreme Court of Missouri. Accordingly, we decline to extend the application of the *res ipsa loquitor* rule of evidence to these claims.

14. Similarly, in *Robbins v. Webco, Inc.*, 369 S.W.3d 787, 789 (Mo.App. S.D.2012), we declined to extend strict liability to workplace injuries under the Workers' Compensation Law. We found "[t]here is no strict liability because a workplace injury is not compensa-

Therefore, the Commission did not err in refusing to apply the doctrine of *res ipsa loquitor* to Porter's claim. The Commission's order denying compensation is affirmed.

GARY W. LYNCH, P.J. and NANCY STEFFEN RAHMEYER, J., concur.

ble absent 'causal connection of the work activity to the injury other than the fact of its occurrence while at work.' " *Id.* (quoting *Miller*, 287 S.W.3d at 674).